[No. B216425. Second Dist., Div. Three. May 2, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
PHILLIP SPECTOR, Defendant and Appellant.

1340

**COUNSEL**

Riordan & Horgan, Dennis P. Riordan, Donald M. Horgan; and Charles Sevilla for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, and Lawrence M. Daniels, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**KLEIN, P. J.**—Defendant and appellant, Phillip Spector, appeals the judgment entered following his conviction, by jury trial, for second degree murder with firearm use enhancements (Pen. Code, §§ 187, 12022.5, 12022.53, subd. (b)). He was sentenced to state prison for a term of 19 years to life.

The judgment is affirmed.

## INTRODUCTION

Phillip Spector was convicted of murdering Lana Clarkson, a woman he met one night at the House of Blues nightclub in Los Angeles, where she was working. Clarkson accepted Spector's invitation to visit his home. They were driven there by Adriano De Souza, Spector's chauffeur. According to De Souza, Spector came out of the house two hours later with a revolver in his hand and said he had killed someone. The police subsequently found Clarkson's body slumped in a chair near the back door of Spector's house. There was a revolver on the floor underneath one of her legs. She had been shot once in the head and neck, the bullet having entered through her mouth. Spector and Clarkson were the only two people inside the house when Clarkson was shot.

The question at trial was whether Spector had committed implied malice murder by killing Clarkson in the course of assaulting her with the gun, or whether Clarkson had used the gun to shoot herself, either committing suicide or killing herself accidentally. Because Spector could not be convicted solely on the basis of his extrajudicial confession to De Souza, the prosecution sought to provide corroborating evidence in the form of crime scene forensics and "other crimes evidence" demonstrating his long history of violence toward women in similar situations. Spector did not testify. The defense put on forensic and mental state evidence trying to show Spector could not have fired the gun and that Clarkson had reasons to commit suicide.

A key question at trial was what the resulting forensic evidence would have been if Clarkson, rather than Spector, had fired the gun. In this regard, Spector contends the trial court erred by admitting into evidence a videotape in which the trial judge purportedly acted as a witness for the prosecution. We will hold, however, that this videotape merely shows the trial judge seeking to clarify a prosecution criminalist's ambiguous testimony.

Spector contends the trial court erred by admitting the "other crimes evidence" consisting of testimony from five women who, over a 20-year period, were the victims of armed assaults by Spector. We will conclude this

evidence was properly admitted to prove Spector's motive for committing implied malice murder and that Clarkson's death was not self-inflicted. We will conclude the trial court properly admitted "generic threat" evidence tending to show Spector's state of mind at the time of his fatal encounter with Clarkson, and that the jury was properly instructed on how to consider all of this evidence.

Finally, we will reject Spector's contention there was prosecutorial misconduct during closing argument and conclude the prosecution neither impugned the personal integrity of defense counsel, nor improperly attacked the credibility of the defense expert witnesses.

## BACKGROUND

Defendant Spector was originally tried in 2007. That trial ended in a hung jury. Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]), the evidence presented at Spector's 2008–2009 retrial established the following.

1. *Prosecution evidence.*

 a. *The shooting.*

 (1) *Spector meets Clarkson at the House of Blues.*

Adriano De Souza was working as a valet parking attendant at the Grill in the Alley (the Grill), a Beverly Hills restaurant. There he met Spector's chauffeur, who asked if De Souza wanted to work as Spector's backup driver. De Souza agreed because he could make between $30 and $40 an hour driving for Spector. By February 2003, De Souza had driven Spector between 12 and 15 times over the course of three or four months.

These backup driving jobs were arranged by Michelle Blaine, Spector's secretary, who would call De Souza a few hours before he was needed. De Souza would arrange for someone to cover his shift at the Grill and then drive his own car to Spector's house in Alhambra. After going through the main entrance gate, De Souza would drive to the back of the house, park, prepare Spector's car and wait for him to come out. Spector had two cars, a Rolls-Royce and a brand new Mercedes. De Souza testified Spector would tell him where to drive and that he always understood Spector's directions. He and Spector communicated easily, although if Spector had been drinking he was sometimes hard to understand.

De Souza had been born in Brazil and he grew up there. He began studying English in school when he was 11 or 12 years old. In college he earned

a B.A. degree in computer science. The instructional materials for his computer courses were in English. He had served for eight or nine years in the Brazilian military.

On Sunday afternoon, February 2, 2003, Blaine called and asked De Souza to drive for Spector that night. De Souza arrived at Spector's house in the early evening and prepared the Mercedes. Spector got into the car carrying a leather briefcase and told De Souza to drive to Studio City, where his friend Rommie Davis lived. Davis had gone to high school with Spector and then met him again years later at a high school reunion. During 2002, they occasionally went out to dinner together, but they were not romantically involved.

De Souza picked Davis up and then drove to the Grill. Spector and Davis went inside for dinner. Spector had one daiquiri and at least part of another during dinner. When he ordered the second daiquiri, Davis "suggested that it wasn't a good idea because he was acting silly." Spector ignored her and continued to drink. He appeared to be a little drunk. They finished dinner between 9:30 and 10:00 p.m. Davis wanted to get to bed early because she had to work the next day.

Kathy Sullivan was working at the Grill that night as a server. She first met Spector in 1997 and had socialized with him occasionally for a year or two, always in the company of her friend, Susan. Sullivan and Susan would visit Spector at his Alhambra house. Sullivan testified her relationship with Spector was entirely platonic and had never been romantic; she described Spector as acting "fatherly" toward her. She stopped visiting him when she lost touch with Susan in 1999. Then, after Susan came to work at the Grill, Sullivan would sometimes see Spector at the restaurant.

On Sunday night, February 2, 2003, Sullivan greeted Spector and Davis when they came into the Grill. After finishing her shift, Sullivan was eating when another restaurant employee came over and asked if she and her coworker Karen wanted to join Spector for a drink. Karen declined, but Sullivan went over to Spector's table and then accepted his invitation to go to Trader Vic's. Spector and De Souza took Davis home and returned to the Grill to pick up Sullivan. De Souza and Sullivan knew each other because they both worked at the Grill.

At Trader Vic's, Spector and Sullivan went to the bar. Spector ordered and drank a Navy Grog and Sullivan had an Amaretto sour. Spector ordered a second Navy Grog, but may have taken no more than a sip of it. Then they returned to the Mercedes. Sullivan said she was tired, but Spector wanted company at Dan Tana's restaurant. Because Dan Tana's was located between

Trader Vic's and Sullivan's apartment, Spector had De Souza drive Sullivan to her car. Sullivan dropped her car off at her Hollywood apartment and got back into the Mercedes.

De Souza arrived at Dan Tana's restaurant about 12:30 a.m. There, Spector ordered a daiquiri and Sullivan ordered another Amaretto sour. They ate some food and ordered a second round of drinks. Spector then suggested going on to the House of Blues. Sullivan agreed, although she really wanted to go home.

At the House of Blues, Spector tried to get into the "Foundation Room," a private VIP section of the club. Euphrates Lalondriz, who worked at the House of Blues doing security, testified he had been training Lana Clarkson to be a hostess and a security officer for the Foundation Room. Working security at the Foundation Room involved taking care of the VIP clientele and checking wristbands to make sure only properly authorized people were allowed in. Spector was a VIP client of the Foundation Room.

Clarkson stopped Spector and Sullivan from entering the Foundation Room because they were not wearing the appropriate wristbands. Spector said, "Do you know who I am?" Sophia Holguin, one of the cocktail waitresses, told Clarkson the man was Phil Spector, a music producer and a multimillionaire. She asked Clarkson to be sure to give Spector a seat in her section because he had previously left her a big tip. Clarkson seated Spector and Sullivan on a sofa in Holguin's section, and told them if they were going to order drinks they had to hurry because it was late.

Holguin took their orders. Spector ordered Bacardi 151, an expensive rum which had double the proof of regular rum. Spector tried to order a drink for Sullivan, but she just wanted water. According to Holguin, Spector seemed irritated and upset by this. In an aggressive, agitated manner, he told Sullivan to "just order a fucking drink," but Sullivan insisted she only wanted water.[1]

Sullivan testified Spector "took the hint and said, 'Oh, you want to go home. Fine. I'll have my driver take you home.'" Sullivan initially thought Spector was being "perceptive and thoughtful," but then he shouted "Get Lana" and, when Clarkson came over, he said "I'm sending Kathy home." This made Sullivan "feel like crap" because Spector made it sound like he was dismissing her. Clarkson escorted Sullivan to the Mercedes. Clarkson told De Souza to take Sullivan home and then bring the car right back.

Meanwhile, Holguin served the water intended for Sullivan. Spector said, "I don't want it. I don't want that fucking water." Spector downed his drink

---

[1] Sullivan denied Spector was angry at her for not ordering a drink. She testified he did not say, "Have a fucking drink."

in one swallow. He appeared to have drunk a lot of alcohol and he "definitely appeared intoxicated." Spector asked Holguin to have a drink with him. When she explained she could not drink with him because she was working, Spector asked her to go home with him. Holguin said she could not because she had something to do the next day. Holguin testified Spector was "hitting on" her, and that he was also hitting on Clarkson.

After Sullivan left, Clarkson came into the room, fluffing up the pillows on the couch and making small talk with Spector. Holguin testified this was not how Clarkson usually behaved with customers, and it seemed she was doing it because she had learned Spector was a wealthy VIP. At one point, Spector commented that Clarkson was "acting like fucking Charlie Chaplin." He told her to just calm down and have a drink with him. Clarkson had to get permission from her manager, who said she could sit with Spector but not have a drink. After Spector finished his Bacardi 151, he asked for another drink. Holguin said she needed her manager's approval because of the time. The manager refused to approve any more alcohol and Holguin closed out Spector's tab.

Lalondriz walked into the Foundation Room just as Clarkson, who had completed her job duties for the night, was about to leave. Spector asked if she needed a ride and Clarkson said yes. Spector then asked, "Do you want to go to the house so we could talk?," but Clarkson said she just wanted a ride to her car.

Spector and Clarkson left the House of Blues about 2:20 a.m. While they were standing by the Mercedes, De Souza heard Spector say, "Let's go to the Castle, let's go to the Castle." This was a reference to Spector's Alhambra house, a replica of a Pyrenees castle which had been built in 1926. Clarkson again declined. She said she was tired and she could get into trouble if she left with a client. She asked Spector to take her to a parking structure near the House of Blues so she could retrieve her car. Spector agreed. They got into the Mercedes and De Souza drove to the parking structure.

Spector said he needed a bathroom and Clarkson said he could go behind one of the walls. When De Souza stopped, Spector got out and urinated behind a wall inside the parking structure. Clarkson got her car and De Souza followed her as she parked it on the street nearby. Clarkson then got back into the Mercedes, telling De Souza she was just going for a drink. Spector got upset and screamed, "Don't talk to the driver, don't talk to the driver."

(2) *Arrival at Spector's home.*

De Souza drove Spector and Clarkson to Spector's house. During the drive, De Souza smelled alcohol coming from the back of the Mercedes.

Spector and Clarkson were watching a DVD, and talking and laughing. De Souza got to the house about 3:00 a.m. He dropped Spector and Clarkson in front of the house and then drove around to the back, where he parked in a motor court just six feet from the rear door of the house. De Souza collected some things that had been left in the back of the Mercedes, including Spector's leather briefcase, cell phones and a DVD player.

Spector came out the back door a short time later and De Souza handed him the DVD player. De Souza then walked to the open back door, reached inside, and put Spector's briefcase onto a chair that was sitting next to the entrance. De Souza did not see or hear Clarkson at this time. Spector went back into the house and closed the door. About 3:20 a.m., De Souza got back into the Mercedes to wait until it was time to give Clarkson a ride back to Hollywood.

Around 5:00 a.m., De Souza was startled by a sharp noise which sounded like a "pow" or a "bang." He got out of the Mercedes to investigate. For two or three minutes he looked around, but he could not find anything, so he got back into the car and shut the door.

A few seconds later, Spector opened the back door. He was wearing the same clothes he had been wearing earlier that night: black pants, a black shirt, and a white or cream-colored jacket. De Souza got out of the Mercedes because he thought it was time to give Clarkson a ride. Spector stepped out onto the back porch and De Souza could see he was holding a revolver in his right hand. Spector said, "I think I killed somebody." De Souza testified he did not have any trouble hearing what Spector said.

De Souza thought he saw a "little bit of blood" on Spector's right index finger. Behind Spector, De Souza could see a woman's legs through the open back door. When he stepped to one side to get a better view, he could see Clarkson's entire body. She was sitting slumped in a chair, sort of half in the chair and half on the floor, with her legs extended out in front of her. There was blood on her face. De Souza asked Spector what happened. Spector shrugged his shoulders but he did not say anything. He had a blank look on his face.

De Souza got scared when he realized Clarkson might be dead and he started running away from the house. He tried to use his cell phone, but he was so disoriented he could not manage it at first. Then he ran back to the Mercedes, got in and drove to the main entrance gate.

When he calmed down enough to use his cell phone, De Souza called Michelle Blaine, Spector's secretary, because her number had been programmed into his cell phone. He called Blaine because he did not know

Spector's street address, which he wanted so he could give it to the police. When Blaine did not pick up, De Souza left her the following message: "Michelle. Michelle. It's Adriano, Michelle. Michelle, I have to—you have to come to, to Mr. Phillip's house. I think he killed some—a lady. Please call me, call me back. I'm gonna call the police right now."

De Souza found Spector's address posted on a sign outside the front gate and he called 911. The call was recorded at 5:02 a.m. De Souza told the CHP (California Highway Patrol) dispatcher, "I think my boss killed somebody." Asked why he believed there had been a killing, De Souza said: "Because . . . he have a lady on the, on the floor and he have a gun in, in his hand." After the dispatcher transferred the call to the Alhambra Police Department, the following exchange occurred: "ALHAMBRA: Okay. So have you seen your boss? [¶] DE SOUZA: Yes. He had, he had the gun in his hand."

The first officer to respond to the shooting scene was Alhambra Police Officer Brandon Cardella. He saw De Souza standing next to a black Mercedes, waving his arms frantically. De Souza told Cardella he heard a gunshot and then saw Spector with a gun in his hand. According to his police report, which Cardella wrote less than two hours later, De Souza said he heard Spector say, "I think I just kill [sic] her."

Police witnesses testified De Souza was not allowed to go back up to Spector's house.

About 8:30 a.m., De Souza was interviewed by Alhambra Police Officers Esther Pineda and Garrett Kennedy. De Souza told them he saw Spector with a revolver in his right hand and heard him say, "I think I killed somebody." De Souza described seeing Clarkson: "She was, I think, half in the—in the chair and half on the floor," and she had blood on the left side of her face.

De Souza was subsequently interviewed at the Alhambra Police Department by Detectives Paul Fournier and Rich Tomlin about 9:45 a.m. that same morning. De Souza said that when he picked up Spector and Clarkson from the House of Blues, Spector was "completely drunk." De Souza said that when Spector came out the back door he had a gun in his hand and he said, "I think I, I, I killed somebody."

(3) *Police response and crime scene findings.*

Four other police units arrived after Cardella. The group of officers walked through the front gate and up the driveway. They moved slowly because Spector's property was wooded and very large. They came to a garage which faced the rear of Spector's house. From there, Cardella could see Spector

moving around on the second floor of the house. Eventually, Spector returned to the first floor and then walked out the back door. He stood there, looking at the officers. The officers ordered him to take his hands out of his pockets and put them in the air. Instead of complying, Spector turned around and walked back into the house, saying, "Hey, guys, you've got to come see this." The officers followed Spector into the house and detained him. This was about 40 minutes after Cardella had responded to De Souza's 911 call.

The officers found Clarkson's body slumped in a chair in a foyer near the back door. Her legs were extended straight out in front of her and her left arm hung down by her side. Her right hand was draped over the right arm of the chair, resting on a purse. The purse straps "were wrapped around her shoulder, and somewhat twisted, and then wrapped around the right-hand arm of the chair twisted in an unnatural fashion." There was blood on her face and blood on her chest.

Underneath Clarkson's left calf was a .38-caliber, six-shot Colt Cobra revolver. The gun was loaded with five live rounds and there was a spent round under the hammer. The gun was bloody. There was blood on both sides of the wooden grips, on the trigger guard, on the frame directly in front of the wooden grips, and on the metal strap securing the grips. A part of Clarkson's artificial tooth had lodged in the front sight of the gun. More pieces of artificial tooth were found on the floor across the foyer from Clarkson's body.

Next to Clarkson was a bureau or side table. One of its drawers was partially open. Inside this drawer there was a leather holster. The Colt Cobra fit into this holster.

Six feet to the left of Clarkson's body was a leather valise sitting on a chair.[2] The valise had the initials "PS" and it contained various personal items, including a three-pack of Viagra, of which only one of the original three pills remained. Underneath the valise was a small portable DVD player. There were two working cell phones clipped to the outside pockets of the valise. There was also another phone in the foyer. There was blood on the doorknob and on the latchbolt assembly of the back door. The thumb lever for the dead bolt was in the "off" position and did not have any blood on it, which meant it had not necessarily been touched at the same time or by the same hand that left bloodstains on the doorknob and the latchbolt.

There was a formal living room off the foyer. This room was very dark, with the only light coming from some candles on top of the fireplace. On a coffee table, there was an almost empty bottle of tequila and a brandy snifter containing alcohol. Background music was playing.

---

[2] Presumably this was the leather "briefcase" De Souza had retrieved from the Mercedes.

There was a small bathroom nearby. In the bathroom, there was a matching brandy snifter containing a small amount of alcohol. A pair of false eyelashes was sitting on top of the toilet tank. On the floor of the bathroom there·was a cotton diaper covered with blood on both sides. This diaper had also been soaked with water.

On the second floor of the house was the master bedroom. Inside the bedroom closet was a white jacket stained with blood. This jacket was lying crumpled on the closet floor.

Sean Hecker, an officer with the Alhambra Police Department, responded to the crime scene and was asked to escort Spector, who already had been taken into custody, to the police station. Hecker did so and also obtained gunshot residue samples from Spector's hands. During that process, Spector told Hecker he was right handed. Hecker did not notice any blood on Spector's hands.

Jaime Lintemoot, a criminalist with the Los Angeles County Coroner's Office, was part of the coroner's response team that analyzed the crime scene. Lintemoot collected blood swabs from Clarkson's hands and wrists. She took one swab from "the backside of the right wrist" where she saw "red, mist-like drops consistent with blood." She collected two sets of swabs from Clarkson's left hand: "One . . . from the backside of the wrist of the left hand, and the other was from the inside of the wrist." Lintemoot testified: "There were two regions on which I thought there was possible blood. One was the backside of the wrist, and this consisted of the fine, mist-like spots. The other area . . . appeared to be . . . a larger area and appeared to be more of a smear." By "smear" Lintemoot meant a contact or transfer bloodstain.[3]

Regarding Clarkson's purse, Lintemoot testified: "It was a leopard print purse with a long black strap, and the black strap was going over the decedent's right arm. The purse was resting on the floor. [¶] The interesting thing was that the purse was rotated almost . . . 180 degrees. The back of the purse strap appeared to have caught the edge of the seat or the arm of the chair and got flipped around when it landed."

(4) *Other forensic evidence.*

Deputy Coroner Louis Pena conducted the autopsy. He concluded Clarkson died from a single gunshot wound to the head and neck. The bullet entered

---

[3] Defense expert Stuart James testified a transfer bloodstain was caused by "blood on an object touching a nonbloody object and leaving some blood behind." In contrast, "impact spatter" consisted of "bloodstains that have ∶ . . . resulted from a force applied to a source of blood."

through her mouth, nicked the upper side of her tongue, traveled to the back of her throat, hit her spinal cord and lodged in the base of her skull. The bullet had completely transected the spinal cord, tearing it from the brain stem and cutting it in half. This meant Clarkson would have immediately lost all bodily function the moment she was shot. A forensic neuropathologist confirmed the bullet had separated Clarkson's spinal cord from her brain stem.

The trajectory of the bullet was from front to back, and slightly upward. The recoil from the gun fractured and shattered two of Clarkson's upper front teeth. On the left side of Clarkson's tongue there was a bruise consistent with blunt force trauma that could have been caused by the gun's barrel, but not by the bullet. Pena found other injuries on Clarkson suggestive of resistance or a struggle. There was a bruise on the back of Clarkson's left hand which had been caused by blunt force trauma that had been inflicted prior to death. There were bruises on the back of Clarkson's right wrist and on her right forearm, also caused by blunt force trauma. All these bruises had been inflicted during the same event and they were consistent with a struggle, with Clarkson having been grabbed or hit.

Pena concluded Clarkson's death was a homicide, although he agreed intraoral gunshot deaths were usually suicides and only rarely homicides.

Steve Renteria, a prosecution criminalist, testified he found a mixture of both Spector's and Clarkson's DNA in a number of places: on the pair of false eyelashes found in the bathroom; on the brandy snifters; in the blood found on Clarkson's left inner and outer wrist; in the blood found on Clarkson's right wrist. Blood containing a mixture of their DNA was found on the inside doorknob and latchbolt of the back door to the house. Clarkson's blood was on the banister of the staircase leading to the second floor of the house. The diaper found in the bathroom contained thick areas of blood which had been diluted with water in some places. Four DNA samples were taken from the diaper; three of them came entirely from Clarkson.

A swab of the nipple of Clarkson's left breast contained DNA from both Spector and Clarkson. A sample taken from Spector's scrotum contained DNA from two people: Spector and another person who was likely to have been Clarkson. Clarkson's blood was found inside the left front pocket of Spector's pants. The jacket on the floor of Spector's bedroom closet was stained with Clarkson's blood in various places: on the front edge of the left cuff; in the elbow area on the front of the left sleeve; on the inside surface of the left front panel near the abdominal area; on the outside surface of the right front panel near the abdominal area.

Dr. Lynne Herold is a forensic scientist who works for the crime lab at the Los Angeles County Sheriff's Department. Based on her analysis of the forensic evidence, Herold came to the following ultimate conclusions: Clarkson had been sitting slumped in the chair when she was shot; the barrel of the gun was in her mouth and it was being held "upright in a normal, operating manner"; assuming Spector was wearing his jacket when the gun went off, he had been standing within two or three feet of Clarkson when she was shot; Clarkson could not have fired the fatal shot.

Herold explained the specific findings that led her to these conclusions. When Clarkson was shot, she had been sitting in the chair in the same position as when her body was discovered, except that her head had been tilted to the right, not to the left as it was when police found her body. There was blood on the right side of Clarkson's face, on the bridge of her nose, up toward her right cheek and in her hair. Assuming Clarkson had been immediately incapacitated by the gunshot, this evidence meant another person had moved Clarkson's head and smeared the blood on Clarkson's face and hair with the diaper. The evidence was consistent with the diaper having been first wetted with water and then applied to Clarkson's face and hair. It takes at least five minutes, and possibly as long as 15, for blood to clot; so this amount of time passed between the shooting and when someone wiped Clarkson's face.

There were mistlike spatter bloodstains on Spector's white jacket. There was impact spatter (see fn. 3, *ante*), rather than transfer spatter, on the lower edge of the left cuff of Spector's jacket, which shows his cuff had been pointed toward Clarkson's mouth when the gun went off. There were transfer bloodstains on the right outside and left inside front panels of Spector's jacket. This indicated a bloody hand had either opened or closed the jacket. Based on the bloodstain patterns on Spector's jacket, "[h]e had to have been on Lana Clarkson's right-hand side, slightly to the right, such that . . . the left panel of the jacket would be exposed to a high energy back spatter event . . . which would place him within two to three feet of the source of the blood at the time the gun discharged, meaning Lana Clarkson's mouth."

When the gun went off, it was oriented in a normal, upright shooting position. Spector's left arm was raised and extended toward Clarkson's mouth. The barrel of the gun was in Clarkson's mouth and the gun's front sight was at least behind her front teeth. Based on Lintemoot's testimony about finding mistlike blood on the back of Clarkson's wrists, Herold concluded Clarkson could not have fired the gun: ". . . I cannot think of an orientation . . . for Lana Clarkson to be holding the gun that would allow for the deposition [of blood] on the back of the wrists and pull [*sic*] the trigger, given what we know about the position of the gun having to be upright and in her mouth."

If Clarkson had been holding one or both of Spector's hands at the time the gun went off, this would account for the bloodstains found at the scene, including the blood spatter on the back of Clarkson's hands. Although there was smeared blood on the gun's grip, there was no blood in the area of the carpet where the gun was found by the police, which suggested the blood on the gun was already dry when it was placed under Clarkson's leg. Blood on the back of the gun's hammer had to have been transferred there after the shooting event. Something had moved blood on various parts of the gun; this could have happened if someone had wiped the gun.

 b. *Clarkson's activities and plans prior to her death.*

Donna Clarkson, a psychiatric nurse, was Lana Clarkson's mother. Donna testified Clarkson had had a career as an actress and a model. On January 9, 2003, Clarkson and her mother picked up 200 copies of photo headshots Clarkson was planning to use in applying for modeling and acting jobs. Clarkson had an upcoming modeling job for a print advertisement with Siemens, a cell phone company. The photo shoot for the advertisement had been scheduled for February 8, less than a week after the shooting.

On January 22, Clarkson had been hired as a participant in an infomercial for a product called the "Lateral Thigh Trainer." Actors who participate in infomercials get valuable exposure in the entertainment industry. Her participation involved dieting and exercising with the product under the guidance of a personal trainer for a month. At the end of that period, she would give a testimonial during the infomercial. A producer for the infomercial testified she had checked in with both Clarkson and the personal trainer several times and that Clarkson appeared committed to the program. The infomercial itself was scheduled to be filmed over two days beginning February 17 or 18.

Clarkson worked at the House of Blues on Friday, January 31, 2003. The next morning, she attended the Comic-Con science fiction convention. Having acted in the movie Barbarian Queen (Concorde Pictures 1985), Clarkson enjoyed going to such events to sign autographs and interact with her fans. On Saturday night, Clarkson again worked at the House of Blues.

On Sunday, February 2, Clarkson made plans to attend a party hosted by a good friend; she wrote an RSVP saying, "Can't wait, love, Lana." Also on February 2, Clarkson and Donna went shopping for flat shoes Clarkson could wear while working at the House of Blues. Clarkson ended up buying eight pairs of flat shoes, which Donna paid for. When Clarkson and Donna parted company that day in the late afternoon, Clarkson said, " 'Thank you for the shoes, Mom. I love you,' " and " 'I'll call you tomorrow.' "

After the shooting, Donna went into Clarkson's apartment with the police. They found tax-related documents organized into several piles, apparently in preparation for an appointment Clarkson had scheduled with her accountant for February 4.

### c. *The other crimes evidence.*

### (1) *Dorothy Melvin.*

While working as a personal manager for the comedian Joan Rivers, Dorothy Melvin occasionally dated Spector between 1989 and mid-1993. They did not see each other all that often during this time because she traveled a lot and he tended to be reclusive. They had a sexual relationship. Melvin described Spector as "[b]rillant beyond belief," and "a very charming, lovable man when he wants to be. He is a wonderful person to be around, and when he is drinking and he gets to a certain point, then he totally loses it, and he becomes this demon."

In July 1993, Melvin visited Spector at his home in Pasadena. She had never been there before. During the evening, Spector drank a lot of vodka and was being very charming. Then he disappeared for a while and Melvin fell asleep on a couch. She awoke before daybreak and discovered Spector pointing a .38 snub-nose revolver at her brand new car.

Melvin screamed at Spector, "What the [fuck] do you think you're doing?" Spector told her to go back into the house. When Melvin kept screaming at him, Spector hit her in the head with the gun and said, "I told you to get the [fuck] into the house." Melvin returned to the house. Spector followed her and started going through her purse. He accused her of looking for things to steal and sell. He told her to take her clothes off and go up to the third floor, where Melvin assumed his bedroom was. All the while, Spector was waving the gun around, sometimes pointing it at her.

When Melvin refused to take her clothes off, Spector hit her in the head with the gun again. Melvin was terrified. She managed to retrieve her car keys, run out of the house, get into her car and start driving, but the entrance gate was closed. As Melvin sat in her car at the gate, she saw Spector running down the driveway with a pump-action shotgun. Spector worked the pump and screamed, "I told you to get the [fuck] out of here." When Melvin said the gate would not open, Spector suddenly became calm again and asked quizzically, "Gate won't open?" Then he said, "Well, I'm going to go back and open it," and he ran back to the house and opened the gate. Once Melvin got through the gate she called 911 and made a police report.

(2) *Stephanie Jennings.*

In 1994, Stephanie Jennings, a photographer with a professional interest in the music business, began a long-distance dating relationship with Spector. Jennings lived in Philadelphia and had an agency in New York, while Spector's primary residence was in Pasadena.

In January 1995, Jennings was Spector's guest at a Rock and Roll Hall of Fame inductee award dinner and a Waldorf-Astoria afterparty. At the afterparty, Spector was drinking heavily, being unpleasant and making obnoxious remarks. The more Spector drank, the louder and more boisterous he became.

Jennings left the party between 2:00 and 3:00 a.m., and took a taxi back to the Carlyle Hotel. She went to her room and fell asleep. She was awakened when one of Spector's bodyguards knocked on her door and said Spector wanted her to join him in his room. Jennings said she would see him the next day. After Jennings went back to sleep, Spector himself knocked on her door and said he wanted her to join him in his suite. When Jennings declined, Spector got angry, yelled at her and demanded that she come. He reminded her he was paying for her hotel room. He said if she did not come to his suite, she'd have to leave and pay for her own hotel.

Jennings said she would do just that. Spector entered her room and they argued while she packed. Scared by Spector's anger, Jennings was upset and crying. When she started packing up her things in the bathroom, the argument became more heated. Spector pushed or slapped Jennings, causing her to fall backwards onto the toilet. She got up and pushed Spector, who fell into the bathtub, knocking down the shower curtain. Spector jumped up and left the room.

As Jennings finished packing, Spector returned. He pulled a chair in front of the door and sat down, blocking her exit. He had a gun in his hand. He was waving the gun around, sometimes pointing it at her. Jennings was even more scared than before. She could not leave the hotel room because Spector was holding her at gunpoint. She sat on the bed, crying, and asked Spector to let her leave. Spector would not let her leave with her bags, but since they contained her photographic equipment Jennings would not leave without them. Jennings picked up the phone and called 911. Spector thought she was calling her mother and said, "You can call your mom all you want. There is nothing she can help you with now." The 911 operator managed to take a report with Jennings only having to answer yes or no. Officers were dispatched and they came to the room with the hotel manager; Spector left Jennings's room just before they arrived.

(3) *Devra Robitaille.*

In the 1970's, Devra Robitaille, a British pianist, worked for Spector as the administrative director of his record label, Warner-Spector Records. Robitaille idolized Spector and believed he was a genius. A year after she started working for him, they began a romantic relationship which, for her, was an extramarital affair. During this time, Robitaille frequently organized parties for Spector at his Beverly Hills home. She attended these parties as an employee, not as a guest.

At one of these parties, probably in 1975, the guests had all gone and Robitaille was standing in the foyer, very tired and wanting to leave. The door was locked, so she asked Spector to let her out. Spector left the foyer for a few minutes. Robitaille was standing there with her purse and jacket, ready to leave, when she felt the barrel of a gun touch her temple. She turned and saw Spector holding a shotgun. He had been drinking that night and he was very drunk. Spector said, "If you try to leave, I'm going to blow your fucking head off."

When Robitaille said she had to leave, Spector swore and shouted at her, saying things like "I'm going to blow your head off. I'll blow your brains out. You can't leave. I'm not unlocking the door." He was still holding the gun to her head; Robitaille stood her ground, saying, "Just stop it. This is ridiculous. I just want to go home." Suddenly, Spector's demeanor changed: "I remember him just sort of—I can't describe it any other way. He just sort of relaxed, and the moment passed, and he went and got the keys, and unlocked the door, and let me go." "There was a little moment of suspension, and then he became Phil again. I didn't recognize the other maniac."

As a result of this incident their romantic relationship ended, and then a year later Robitaille ended their business relationship. She returned to England and had a musical career for five or six years. In 1986, she moved back to the United States, reestablished contact with Spector and accepted a part-time job with him in Los Angeles.

That same year, Robitaille went to a party at Spector's house. By the time all the guests had gone, it was very late, possibly dawn. Robitaille was tired and wanted to leave, but the door was locked. She found Spector and asked him to let her out. He was drunk. Robitaille stood near the front door in the foyer with her purse, waiting to leave. Suddenly, Spector pointed a shotgun at her face. He was swearing and making threats: "I'll blow your head off. I'll shoot you. I'll kill you. I'll blow your brains out. I could shoot you right now." He was "[a]ngry, sinister, shouting, bulging veins. There was a look in his eyes that wasn't the look that is him." Robitaille told him to put the gun

down and let her leave. At one point Spector went away, leaving Robitaille in the foyer, still unable to leave. Spector returned and the situation "started to unwind, and he started to unwind, and the tension broke again like it had the first time, and he unlocked the door . . . ." Again, there had been a sudden change in Spector's mood.

Robitaille left and quit her job with Spector. She testified he had been drunk during both the 1975 and the 1986 incidents.

### (4) *Dianne Ogden.*[4]

Dianne Ogden worked in the entertainment industry. In 1982, after having been introduced by Spector's publicist, she accepted a dinner invitation from Spector. At the restaurant, Spector drank alcohol. Afterward, they went to tour his Beverly Hills house. After seeing the house and talking with Spector, Ogden said she needed to go home because she had to work the next day. Spector did not want her to leave. He disappeared and Ogden got ready to go, putting her purse over her shoulder. Then she heard a buzzer go off. Spector had locked the door using a remote control. Ogden pleaded with him to let her leave. She begged him some more and he finally unlocked the door and let her leave.

From 1982 until 1988 Ogden and Spector kept in touch. When Ogden was between jobs in 1988, she accepted Spector's offer to be his paid assistant. In March 1989, she went to his house in Pasadena where he was entertaining some people. Spector drank alcohol during the evening. About midnight, as people were leaving, Ogden said she was going home. Spector did not want her to leave. He went away and she put her purse on her arm in preparation for leaving. Spector then appeared with a rifle and screamed, "You're not fucking leaving." Ogden testified he seemed to have become "demonic": "[H]e was talking and screaming, not being him. He was just like taken over by something, I don't know what, but he wasn't Phillip." Ogden sat down. Then Spector pointed a pistol at her, touching her face with it and screaming that he was going to blow her brains out. He ordered her to go upstairs to his bedroom where, at gunpoint, he made her partially disrobe. He then tried unsuccessfully to have intercourse with her. Ogden testified she had never had a sexual relationship with Spector.

A few months later, Ogden was at Spector's house with a couple of other people. After the others left, Ogden got ready to leave. Once again, Spector disappeared. Then, from behind her, he screamed, "You're not going anywhere. I can't stand the sound of your voice." He said, "I have an Uzi here. I

---

[4] Ogden died after testifying at the first trial, so a videotape of her testimony was played for the jury at the retrial.

am going to kill you." He was holding some kind of gun. Ogden said, "Phillip, stop it. I am just going to go home and don't do this to me again. Please. You're drinking too much." She fled to her car and got in. Spector ran up and banged the Uzi on her window while yelling at her. Ogden ducked down as she drove away fast because she thought he was going to shoot at her car.

### (5) Melissa Grosvenor.

In 1991, Melissa Grosvenor, while working as a waitress in New York, developed a "romantic but platonic" dating relationship with Spector. In late 1992 or early 1993, she accepted an invitation to visit him in California, using an airline ticket he bought for her. They went out to dinner at the Beverly Hills Hotel. Spector had alcohol with his meal. At 11:00 p.m., they went to Spector's house in Pasadena. Grosvenor was tired and had jetlag. Spector had another drink. By this time he was a little drunk.

Between 1:00 and 2:00 a.m., Grosvenor was getting very tired and wanted to leave. "[A]s soon as I told him that I wanted to go, he turned and looked at me, pointed his finger and he said, 'What?' And . . . his whole demeanor changed, and he said, 'You just wait. Wait right there.' " Spector walked off. Grosvenor sat down in a chair with her purse next to her. Spector returned a few minutes later with a handgun. He walked up to her, pointed the gun a couple of inches from her face, and said, "If you [try to] leave, I'm going to kill you." He was irate. He put the gun into a shoulder holster he was wearing.

Grosvenor believed Spector would shoot her if she tried to leave, so she stayed in the chair. She did not say anything, she just cried. Eventually, she fell asleep. She awoke the next morning when Spector tapped her on the foot. He was not wearing the holster and he no longer had the gun. He appeared to be "back to normal."

### 2. Defense evidence.

#### a. Crime scene forensics.

Stuart James is a forensic scientist with a specialty in bloodstain pattern analysis. He concluded some of the bloodstains on Spector's jacket had come from impact spatter and, therefore, that Spector must have been within arm's reach of Clarkson when the gun went off. The stain on the jacket's left cuff was not impact spatter from the gunshot; rather, it was a transfer stain caused by the cuff rubbing up against Clarkson's blood which had been deposited on some other object. James found no blood spatter on the right front panel of

Spector's jacket, including the front of the right sleeve. Based on the photographs of Clarkson's hands taken at the crime scene, James concluded there was impact spatter on the back of Clarkson's left hand, between her thumb and index finger. Given the directionality of this bloodstain, it could not have occurred if Clarkson's palm had been facing outward and held at a 90-degree angle to the floor.

James Pex is another forensic scientist with experience in the field of blood spatter analysis. Based on the photograph of Clarkson's left hand, which showed apparent blood spatter on the back of her hand and wrist area, Pex concluded this bloodstain could only have occurred if Clarkson's thumb had been pointing toward her mouth. There was no spatter on the sleeve of Spector's jacket below the elbow, which was inconsistent with his having done the shooting. A piece of spatter on the back of the jacket's right sleeve above the elbow was inconsistent with his having done the shooting because blood spatter generally "travels in a straight line."

Pex conducted an experiment in which he fired a Colt Cobra at a supply of blood while holding the gun in a normal firing position. He got back spatter on his fingers, which prevented the medallion on the head of the grip screw from getting any blood on it, whereas the medallion on Spector's gun was full of blood. Pex also did a back spatter experiment with a different gun, a Smith & Wesson. When he was testifying, Pex used a photographic slide to illustrate the Colt Cobra experiment, but it turned out the slide he used was actually from the Smith & Wesson experiment.

Pex testified there was impact spatter on the gun's grip that could not have been deposited there if the gun was being held in a normal shooting position when it was fired. Pex had never seen a homicide case with these kinds of bloodstains on a gun's grip. He had, however, seen such bloodstains in suicide cases because of the way the victim had been holding the gun. Pex concluded the Colt Cobra in this case was not being held in a normal firing position when it went off, but that the evidence was more consistent with Clarkson having shot herself.

Werner Spitz is a forensic pathologist. He concluded Clarkson had committed suicide. He testified 99 percent of intraoral gunshot deaths are suicidal in nature, that there was no evidence suggesting the gun had been forced into Clarkson's mouth or that there had been any kind of struggle. The markings on Clarkson's wrists that Pena testified were bruises had been caused postmortem. The prosecutor described for the record Spitz's demonstration of how he believed Clarkson might have been holding the gun: "The tips of his fingers were interlaced. The thumbs were basically touching point to point. His palms facing his mouth. The dorsal portion of his hands facing away from his mouth."

Vincent DiMaio is another forensic pathologist who testified for the defense. After reviewing all the evidence, he concluded Clarkson had shot herself. Ninety-nine percent of intraoral gunshot wounds are self-inflicted, and DiMaio had never seen an intraoral homicide with a snub-nose revolver. The blood spatter patterns on the front of the gun's grip and on Clarkson's left hand were consistent with her having shot herself.

On cross-examination, the prosecutor showed DiMaio a photographic slide James Pex had used to illustrate how Clarkson might have been holding the gun in order to shoot herself. DiMaio testified Pex's suggested hand position was unlikely. DiMaio opined Clarkson would have been holding the gun with only one hand and using the thumb of that hand to pull the trigger. She would have used her other hand either to steady her wrist or to stabilize the gun from above.[5] DiMaio demonstrated how he believed Clarkson had been holding the gun:

"A. It would be this way.

"Q. And again, you have sort of capped the gun, if you will, with the palm and fingers of your [left] hand over the top of the cylinder, your right . . . hand, the fingers wrapped around the back of the grip; your thumb on the trigger?

"A. Yes."

The following colloquy then occurred:

"Q. Now, in that configuration, taking a look at your right hand as it is right now in front of your face, what is the one area of your hand and wrist that would not be exposed to the bloodletting event?

"A. The back of the hand.

"Q. So, if, in fact, Jaime Lintemoot [(the coroner's office criminalist)] found high-velocity spatter on the backs of both the right and left hands of Lana Clarkson, both the right and left hand, you could exclude, as a scientist, that she held the weapon in the way that you just suggested, correct?

"A. No, because you would still get it back on the left, and I told you about the short trajectory blood coming on there, and in addition, well, looping over and hitting the back of the hand."

---

[5] DiMaio testified: "A. My experience has been that it's just the fingers behind the grip. [¶] Q. Okay. [¶] A. The thumb and the trigger guard, and the other hand is steady, and . . . it's not the two hands. It may be steadying the wrists or, you know, on top—it's usually on top of the gun where they are holding it down."

The prosecutor asked:

"Q. . . . Your testimony is the high-velocity, submillimeter-type spatter would come out of her mouth and somehow wrap around and impact this area here?

"A. What I'm saying is, you get all different velocities, and some of the smaller [*sic*] could go on the back of the hand."

DiMaio also testified the grip, frame size, configuration of the grip and shape of the trigger guard were all different on the two guns tested by Pex. In particular, the Smith & Wesson only holds five rounds, instead of six, so the cylinder is smaller. The Smith & Wesson is "a more compact gun. It's actually smaller than the Colt." The position of a hand shooting the two guns "would be different because the frame size is different." DiMaio was asked: "Q. Okay. So the hand that covers the grip on . . . the Smith & Wesson . . . would, by definition, be in a completely different position—and I am talking about the literal measurements of how a hand would wrap around this weapon than a hand would wrap around this [other] weapon, correct? [¶] A. It would be different because the frame size is different."

b. *Evidence about Clarkson's mental state.*

(1) *Expert testimony about Clarkson's mental state.*

Dr. Lakshmanan,[6] the Coroner of Los Angeles County, agreed that intraoral gunshot deaths are usually suicides and only rarely homicides. Asked if "it would be difficult to insert a gun forcefully into somebody's mouth without leaving evidence of blunt force trauma," Lakshmanan testified, "That is correct, unless they're intimidated and they're afraid that somebody will shoot them, and they will open their mouth." Lakshmanan found no evidence of trauma that would suggest the Colt Cobra had been forced into Clarkson's mouth.

Lakshmanan testified he stood by his office's conclusion this had been a homicide. Circumstances he considered included the information that Clarkson had no psychiatric history, no prior suicide attempts or threats, and no suicidal ideation. She had apparently suffered only normal psychological depression after fracturing her wrists in December 2001. On a recent medical

---

[6] This witness's name is actually Lakshmanan Sathyavagiswaran but, due to the difficulty of pronouncing his surname, the parties at trial, with his consent, referred to him as Dr. Lakshmanan. The parties have continued this usage in their appellate briefs and, for the sake of convenience (and without meaning any disrespect), so do we.

questionnaire, Clarkson had left unchecked these questions: "Are you suffering from hopeless outlook, work or family problems, considered suicide, desired psychiatric help?" Clarkson wrote on this questionnaire: "Dealing with these headaches on a 24-hour basis, I'm healthy, exercise, am happy, positive and successful. I'm pretty much a vegetarian, and I don't do drugs anymore." Lakshmanan considered her activities on the weekend before she died. He considered that Spector was almost a complete stranger and that Clarkson was killed with Spector's gun inside Spector's house.

Lakshmanan was asked if he had "ever heard of a case where a person with no suicidal history has gone with a complete stranger to his house for the first time and within three hours of meeting him kills herself?," and he replied, "Not that I recall."

Richard Seiden, a psychologist and former professor at the University of California at Berkeley, testified as a suicide expert. He explained that impulsive, spur-of-the-moment suicides, as opposed to planned suicides, account for 40 percent of all suicides and might involve no more than five minutes, contemplation. Impulsive suicide is not correlated with clinical depression, but rather with feelings of hopelessness about oneself and the future. Hopelessness about finances, loss of a relationship, career disappointments and chronic pain are all correlated with suicide.

Seiden listed various risk factors for suicide, all of which were present in Clarkson's life around the time she died: depressive ideation; suicidal ideation; ongoing problems with drugs and alcohol; financial difficulties; career problems; debilitating injury to her wrists; chronic migraines; and a tendency to impulsivity. Seiden acknowledged Clarkson was not suffering from clinical or major depression. Based on all of these factors, Seiden concluded it would be wrong to rule out the possibility Clarkson had committed suicide.

Seiden acknowledged he had not spoken to any witnesses and none of Clarkson's family, friends or coworkers, although he had read interviews these people had given. Seiden testified he also based his conclusion on the 30 e-mails, written by Clarkson, which the defense had shown him. At the time of Clarkson's death, there were 3,553 deleted and nondeleted e-mails in her computer's in-box, and copies of 1,932 e-mails she had sent out.

Seiden acknowledged that during the 40 years he had spent studying suicide, he could not recall a single case where someone had committed suicide inside the home of a person they had first met a few hours earlier, using that person's gun, and firing the fatal gunshot in that person's presence.

(2) *Lay testimony about Clarkson's mental state.*

The prosecution and defense both presented lay testimony regarding Clarkson's mental state around the time of her death. The defense put on evidence to show Clarkson had been despondent, was having financial difficulties, and had been depressed for much of 2002 after accidentally fracturing both her wrists on Christmas Eve in 2001. Clarkson had been hospitalized for a week and then underwent followup treatment lasting eight months, during which time she had been unable to work.

The prosecution put on evidence to show Clarkson often overdramatized her emotional life, and that her career had been getting back on track in the aftermath of her wrist injury. Nick Terzian, a talent agent specializing in commercials and print advertisements, had represented Clarkson since 1992. He testified that in the fall of 2002, as Clarkson began to recover from her accident, she told him she wanted to go on auditions again. In September or October, Clarkson auditioned to be in a print advertisement for Chesterfield Cigarettes in Spain and beat out almost 500 actors and models for the job. Terzian got Clarkson an interview for a print advertising job for Siemens, the international mobile phone company. She went to the audition on January 22, 2003. On January 31, the Friday before her death, Clarkson was notified she had received the job and she was overjoyed. The fitting for the Siemens job was scheduled for February 4 and the photo shoot was to take place on February 8.

## CONTENTIONS

1. The trial court erred by admitting into evidence the videotape of a witness's testimony from the first trial.

2. The trial court erred by admitting "other crimes evidence" concerning Spector's gun assaults on other women.

3. The trial court erred by admitting "generic threat" evidence.

4. There was prosecutorial misconduct during closing argument.

## DISCUSSION

1. *Trial court did not err by admitting videotape of testimony from the first trial.*

Spector contends the trial court erred by admitting into evidence a short videotape, made during an evidentiary hearing at the first trial, in which

criminalist Jaime Lintemoot described where she had seen blood spatter on Clarkson's hands. Spector claims he was unfairly prejudiced because the videotape showed the trial court's personal intervention during Lintemoot's testimony. This claim is meritless.

 a. *Background.*

As our description of the trial testimony demonstrates, the forensic evidence was fiercely contested, particularly the question whether bloodstains on Clarkson's hands proved she could or could not have shot herself.

A key part of the prosecution's forensic case was the testimony of Lynne Herold, the Los Angeles County Sheriff's Department criminalist, who concluded Clarkson could not have fired the gun. Asked if the presence of "mist-like spatter or small pinprick spatter" on the back of Clarkson's hands and wrists would be inconsistent with Clarkson having held the gun in a firing position, Herold testified it was not only inconsistent, it was an impossibility. As Herold explained, "[B]lood, to get on that side due to being mist-like and associated with the gunshot, would have to fly around a corner to hit the target, and that doesn't happen." On cross-examination, Herold indicated she was relying on Jaime Lintemoot's testimony, at the retrial, regarding "blood staining on [Clarkson's] hands."

On appeal, Spector claims the strength of Lintemoot's testimony had been improperly and unfairly bolstered by the trial court's own words and actions while Lintemoot was testifying at an evidentiary hearing during the first trial. This issue arose in the following way.

Lintemoot testified to the jury at the first trial about having observed bloodstains on Clarkson's hands at the crime scene. Lintemoot's handwritten notes, which she made at the scene, referred to blood spatter on the "outside" of Clarkson's wrists.[7] Her subsequently prepared typed report,[8] however, stated only: "Small red stains were also observed on both of the decedent's hands and wrists." Crime scene photographs of Clarkson's hands, which had been taken at Lintemoot's direction but not by her, came out badly and were apparently of little use for confirming this aspect of Lintemoot's observations. At an evidentiary hearing held outside the jury's presence, the following colloquy occurred:

"By Mr. Jackson [(the prosecutor)]:

---

[7] Lintemoot's contemporaneous notes said: "Right wrist—some small apparent blood splatter [*sic*] outside of wrist," and "Left Wrist . . . outside blood splatter."

[8] The typed report is dated March 10, 2003.

"Q. What you believe to be mist-like spatters were on you indicated, if I am not mistaken, on her wrists?

"A. On the outside of the decedent's wrists.

"Q. All right. Not on her hands per se?

"A. Just in this area (indicating), two or three-inch radius around, around the wrists.

"The Court: I would say it's from—if you take where the wrist joint is, the two to three-inch radius would be in a circle from that point. [¶] Would that be correct?

"Mr. Jackson: The interior wrist, that portion of the wrist joint—

"The Court: That's the exterior, isn't it? The interior would be this part, the exterior would be where she was pointing.

"Mr. Jackson: Actually, I was making a differentiation between this part of the joint and that part of the joint.

"The Court: Why don't you show us. That would be the best.

"The Witness: Exterior. So the outside of the wrist area.

"Q. By Mr. Jackson: Okay. The outside of the wrist.

"A. Yes."

As discussed *ante*, Lintemoot testified at the retrial about having seen mistlike bloodstains on the back of Clarkson's wrists. On cross-examination, defense counsel asked her: "And in both cases, with respect to both hands, the spots that you saw were on what you would now describe as the forward portion of my right hand, the forward portion of my left hand? [¶] A. Not the finger region. [¶] Q. Not [the] finger region, but . . . above the webbing of the thumb opposite the palm? [¶] A. Correct."

The prosecutor later recalled Lintemoot to the stand to clarify this exchange with defense counsel. Lintemoot testified: "The area that I saw the mist-like blood spatter was on the back of the decedent's wrist area, so the side opposite of the palm, and it was about a two- to three-inch radius around the joint here." The prosecutor clarified Lintemoot's demonstration for the record: "[Y]ou used your left hand to show the jury the backside, and you

started at the joint of the wrist, and you made a motion, a circular motion of a two- to three-inch radius; is that correct?" Lintemoot agreed it was. The prosecutor then asked:

"Q. Okay. Now, it was brought to my attention, because I didn't see it, but I think what [defense counsel] had used, in demonstrating his hands, were what I would describe as the area around the web between the thumb and the index finger. [¶] Do you recall that?

"A. He was pointing to that area.

"Q. Is that correct?

"A. That is not correct in that is where the blood spatter was. It was not on the fingers. It was not on the thumb. It was on the backside of the hand-wrist area."

Again cross-examining Lintemoot, defense counsel asked:

"Q. I didn't just show you my hands. I described and pointed to what I was talking about when we were together earlier, didn't I?

"A. You did.

"Q. And so it wasn't just . . . showing you my hands. I pointed and described web, back of hand, opposite of palm, and you said 'yes,' correct?

"A. Back of hand, not the web.

"Q. Back of the web up here. That is what we were talking about. We were looking at both hands, and I was pointing to it. You looked at me, and you said 'Yes, that's correct'?

"A. Well, not the web of the hands.

"Q. No. No. What I am saying is, we stood here . . . and I showed you my hands, and I pointed to an area, and you said I was correct; isn't that right?

"A. That's correct.

"Q. All right. So, we can call it anything we want, but we have actually demonstrated what we are talking about, didn't we?

"A. I have demonstrated what I was talking about."

On redirect, the prosecutor asked:

"Q. Now, when [defense counsel] . . . used his hand to demonstrate the web area between the thumb and the finger, did you intend to agree with [him] that that is where you saw what you believed was blood spatter?

"A. No."

The prosecutor then read to Lintemoot the reporter's transcript of her testimony on the disputed videotape and asked:

"Q. Do you recall that question-and-answer series?

"A. Yes, I do.

"Q. And that is consistent with what you have now clarified for us, if there was any confusion, correct?

"A. That's correct."

This immediate cross-examination then followed:

"Q. Didn't you just tell it was on the middle of the back of her hand?

"A. Not the hand, the wrist.

"Q. The wrist. Well, so what's exterior or outside?

"A. Exterior is another way of saying outside. So, exterior, outside, posterior.

"Q. The spatter was outside of the wrist, correct?

"A. On the outside, the outside wrist.

"Q. And you have no photos of it?

"A. No."

Subsequently, defense counsel asked Dr. Lakshmanan, the coroner, about a meeting he had attended with members of the district attorney's office to discuss concerns about the case, one of which was Lintemoot's failure in her typed report to describe the exact location of the blood swabs she had taken from Clarkson's wrists. Lakshmanan testified that when he asked Lintemoot

about this, she simply read him the notes she had taken at the crime scene. The prosecution then played the contested videotape of Lintemoot's testimony at the first trial, in which she described where she had seen the blood spatter. Lakshmanan testified this videotape would be the best guide to what Lintemoot had actually seen.

### b. *Spector's legal argument.*

On appeal, Spector asserts the basis of his contention "is not whether Judge Fidler [(i.e., the trial court)] did anything inappropriate in making a record at the 2007 [evidentiary] hearing at which he was the finder of facts . . . . Plainly he did not. The question is whether his statements and observations made other than from the witness stand could be introduced as evidence of appellant's guilt at Spector's 2009 retrial, absent any opportunity for appellant to confront the testimonial statements against him." Spector contends that, in permitting this videotape to be shown to the jury, Judge Fidler erred by admitting hearsay evidence; committing a confrontation clause violation under *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354]; impermissibly acting as both judge and witness at the retrial; and violating Spector's right to be in attendance when inculpatory evidence was presented.

All of Spector's claims fail, most fundamentally because they are predicated on his mistaken assertion the trial court's statements and actions on the videotape were admitted into evidence to establish the truth of a material fact.

### (1) *Trial court has power to clarify testimony.*

■ Spector properly disavows any claim Judge Fidler's conduct at the evidentiary hearing itself was improper. A trial court's power, indeed its responsibility, to clarify testimony is well settled in California. "A trial court has both the discretion and the duty to ask questions of witnesses, provided this is done in an effort to elicit material facts or to clarify confusing or unclear testimony." (*People v. Cook* (2006) 39 Cal.4th 566, 597 [47 Cal.Rptr.3d 22, 139 P.3d 492].)

■ "Numerous courts including our own have recognized that *it is not merely the right but the duty of a trial judge* to see that the evidence is fully developed before the trier of fact and *to assure that ambiguities and conflicts in the evidence are resolved insofar as possible*. [Citation.] As we expressed at length in *People v. Rigney* (1961) 55 Cal.2d 236, 241 [10 Cal.Rptr. 625, 359 P.2d 23]: 'A trial judge may examine witnesses to elicit or clarify testimony [citations omitted]. Indeed, "it is the right and duty of a judge to conduct a trial in such a manner that the truth will be established in

accordance with the rules of evidence." ' Similarly, as noted in *People v. Lancel[l]otti* (1957) 147 Cal.App.2d 723, 730 [305 P.2d 926]: '[I]t has been repeatedly held that *if a judge desires to be further informed on certain points mentioned in the testimony it is entirely proper for him to ask proper questions for the purpose of developing all the facts in regard to them.* Considerable latitude is allowed the judge in this respect as long as a fair trial is indicated both to the accused and to the People. Courts are established to discover where lies the truth when issues are contested, and the final responsibility to see that justice is done rests with the judge.' " (*People v. Carlucci* (1979) 23 Cal.3d 249, 255 [152 Cal.Rptr. 439, 590 P.2d 15], italics added.)

### (2) *There was no hearsay or* Crawford *error.*

Spector argues: "[R]espondent's claim that the trial court's statements 'were admissible for the non-hearsay purpose of giving context and meaning to Lintemoot's responses' and 'functioned only as questions that placed Lintemoot's testimony in context' is belied by the fact that the most critical exchange on the tape contained only statements and gestures made by Judge Fidler and replies by prosecutor Jackson; there are no 'responses' from Lintemoot during this exchange. [Fn. omitted.] Judge Fidler's statements and gestures were coming in not to 'place[] Lintemoot's testimony in context,' as respondent now contends, but rather to independently supplement the witness's testimony, which, standing alone, was quite unclear." Spector complains: "When he . . . admitted the video over defense objection, Judge Fidler justified his ruling by stating: '[A] court may define and describe what a witness is doing . . . I had the best view of Miss Lintemoot, so it was appropriate for me to do it.' Judge Fidler thus stated in no uncertain terms that his statements were intended to establish the truth of what he had claimed to have observed." "Plainly, Judge Fidler admitted his own statements as proof of the truth of what those statements asserted . . . ."

Spector's argument is undone by the videotape itself, which plainly shows the trial court did no more than seek clarification of Lintemoot's testimony. After Lintemoot demonstrated the location of the blood spatter on Clarkson's wrists, Judge Fidler asked a clarifying question: "I would say it's from—if you take where the wrist joint is, the two to three-inch radius would be in a circle from that point. [¶] Would that be correct?" While saying this, Judge Fidler motioned with his hands to indicate where Lintemoot had demonstrated she saw the blood. When Prosecutor Jackson then interrupted to interject his own description and referred to "[t]he interior wrist," Judge Fidler sought to clarify Jackson's use of the word "interior," pointing to the front of his wrist as interior and the back of his wrist as exterior. The prosecutor explained he had only meant to distinguish "between this part of

the joint and that part of the joint," while pointing first to the part of his wrist closer to his thumb and then to the part closer to his pinky finger. *At that point, Judge Fidler turned back to Lintemoot and said,* "Why don't you show us. That would be the best." Lintemoot then motioned with her own hands, while saying: "Exterior. So the outside of the wrist area."

Hence, all Judge Fidler did was to seek clarification regarding which part of her hands Lintemoot had been pointing to as she was describing where she saw the blood. Then Judge Fidler asked the prosecutor why he was referring to "interior wrist" when Lintemoot had been pointing to the back of her wrist. Judge Fidler's intent to merely clarify Lintemoot's testimony is demonstrated by the fact that, immediately following the prosecutor's attempt to explain his own usage of the word "interior," Judge Fidler turned to Lintemoot and said, "Why don't you show us. That would be the best."

We agree with the Attorney General that "the trial court's questions, clarifications, and gestures on the videotape . . . were admissible for the non-hearsay purpose of giving context and meaning to Lintemoot's responses." As the Attorney General points out, it was Lintemoot who "had the final word and final demonstration on this issue, as the trial court directed. Its questions merely facilitated the gathering of information from this witness and were not the evidence itself."

■ Because the trial court's words and actions on the videotape were not admitted for their truth, they did not constitute hearsay, they were not "testimonial," and they did not violate *Crawford*. "In *Crawford v. Washington*[, *supra*,] 541 U.S. 36 . . . , the United States Supreme Court announced a new standard for determining when the confrontation clause of the Sixth Amendment prohibits the use of hearsay evidence—i.e., an out-of-court statement offered for its truth—against a criminal defendant. *Crawford* held that this clause protects an accused against hearsay uttered by one who spoke as a ' "witness[]" ' ' "bear[ing] testimony" ' [citation] if the declarant neither takes the stand at trial nor was otherwise available for cross-examination by the accused." (*People v. Cage* (2007) 40 Cal.4th 965, 969 [56 Cal.Rptr.3d 789, 155 P.3d 205].) Hence, "there are no confrontation clause restrictions on the introduction of out-of-court statements for *nonhearsay* purposes. As *Crawford* confirmed, '[t]he [Confrontation] Clause does not bar the use of [out-of-court] statements for purposes other than establishing the truth of the matter asserted.' " (*Id.* at p. 975, fn. 6.) Contrary to Spector's claim, the video depiction of Judge Fidler did not constitute hearsay evidence.

(3) *There was no due process error.*

Citing a series of federal cases, Spector argues that allowing the prosecution to show the videotape violated the "impartial tribunal" principle of due process, which directs that a trial court may not serve as both witness and judge in the same case. But the cited cases are inapposite because they involve situations in which a judge actually played both roles. (See *In re Murchison* (1955) 349 U.S. 133 [99 L.Ed. 942, 75 S.Ct. 623] [judge presiding at contempt hearing was same judge who served as Mich. " 'one-man grand jury' " during proceeding out of which contempt charges arose]; *Brown v. Lynaugh* (5th Cir. 1988) 843 F.2d 849 [judge presiding at defendant's trial for escape was called as prosecution witness to testify about having witnessed defendant flee from the judge's courtroom]; *Tyler v. Swenson* (8th Cir. 1970) 427 F.2d 412 [in denying defendant's postconviction motion to overturn a guilty plea, judge in effect ruled on his own credibility by relying on his own recollection of what had occurred during plea negotiations].)

In the same vein, Spector points to Evidence Code[9] section 703 (judge as witness)[10] and, relying on *In re Martin* (1977) 71 Cal.App.3d 472 [139 Cal.Rptr. 451], asserts this statute "has been cited as support for barring a judge from sitting in judgment of allegedly contemptuous conduct which the judge observed." But *Martin* simply makes the same point made by the federal cases Spector cites: "[I]n expressing his own recollection as to what transpired at the time of the alleged contempt . . . , Judge Reid, in effect, became a witness against petitioner in violation of the spirit of California Evidence Code section 703, subdivision (b) which prohibits a judge from testifying against objection in any action over which he presides." (*Id.* at pp. 482–483.)

Here, however, Judge Fidler did nothing more than seek to clarify Lintemoot's testimony. Even then, as the videotape makes clear, Judge Fidler ended up turning the whole matter back to Lintemoot by saying, "Why don't you show us. That would be the best." The trial court never became a witness against Spector.

---

[9] All further statutory references are to the Evidence Code unless otherwise specified.

[10] Section 703 provides, in pertinent part: "(a) Before the judge presiding at the trial of an action may be called to testify in that trial as a witness, he shall, in proceedings held out of the presence and hearing of the jury, inform the parties of the information he has concerning any fact or matter about which he will be called to testify," and "(b) Against the objection of a party, the judge presiding at the trial of an action may not testify in that trial as a witness. Upon such objection, the judge shall declare a mistrial and order the action assigned for trial before another judge."

As for the claim that Spector's absence at the videotaped evidentiary hearing violated his due process rights, the record indicates Spector waived his presence at that hearing pursuant to Penal Code section 977.[11]

We conclude the trial court did not commit any errors by allowing the videotape to be shown to the jury.[12]

> 2. *There was no error arising out of the admission of other crimes evidence.*

Spector contends the trial court committed a series of errors in connection with the admission of the other crimes evidence, i.e., the testimony from Melvin, Jennings, Robitaille, Ogden and Grosvenor about violent encounters with Spector during which he threatened them with guns. Spector claims the evidence of these uncharged firearm assaults (1) was improperly admitted to show motive, identity, and the absence of mistake, accident or suicide; (2) should have been excluded as more prejudicial than probative; and (3) was improperly used by the prosecution to argue Spector had exhibited a "pattern" of behavior that was relevant to the question of how Clarkson died.

These claims are meritless.

> a. *General legal principles.*

■ "The trial court has the discretion to admit evidence of crimes committed by a defendant other than the one for which he is charged, if such

---

[11] Penal Code section 977 provides, in pertinent part: "(b)(1) In all cases in which a felony is charged, the accused shall be present at the arraignment, at the time of plea, during the preliminary hearing, during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence. The accused shall be personally present at all other proceedings unless he or she shall, with leave of court, execute in open court, a written waiver of his or her right to be personally present, as provided by paragraph (2). . . . [¶] (2) The accused may execute a written waiver of his or her right to be personally present, approved by his or her counsel, and the waiver shall be filed with the court. . . ."

[12] Spector also mentions that, during closing argument, the "prosecution displayed three still pictures of Judge Fidler as a party who had provided evidence of guilt." However, Spector did not properly raise this as an independent issue in his opening brief, and therefore we decline to address it. (See *Moore v. Shaw* (2004) 116 Cal.App.4th 182, 200, fn. 10 [10 Cal.Rptr.3d 154] ["Ordinarily, an appellant's failure to raise an issue in its opening brief waives the issue on appeal."]; *Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99 [31 Cal.Rptr.2d 264] ["Issues do not have a life of their own: if they are not raised . . . we consider the issues waived."].) Spector briefly referred to these still pictures in the statement of facts relating to his videotape claim, and then in an argument about harmless error relating to the videotape claim. This cursory treatment in Spector's opening brief does not constitute an adequate presentation of the issue. (See *T.P. v. T.W.* (2011) 191 Cal.App.4th 1428, 1440, fn. 12 [120 Cal.Rptr.3d 477]; *City of Oakland v. Public Employees' Retirement System* (2002) 95 Cal.App.4th 29, 51–52 [115 Cal.Rptr.2d 151].) These still photographs have apparently not been made part of the appellate record. Moreover, given the overwhelming evidence against Spector, we cannot see how the issue could have prejudiced him.

evidence is relevant to prove some fact at issue, and if the probative value of the evidence outweighs its prejudicial effect. [Citation.] 'When reviewing the admission of evidence of other offenses, a court must consider (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant. [Citation.] Because this type of evidence can be so damaging, "[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded." [Citation.]' [Citation.]" (*People v. Hawkins* (1995) 10 Cal.4th 920, 951 [42 Cal.Rptr.2d 636, 897 P.2d 574], disapproved on another ground in *People v. Lasko* (2000) 23 Cal.4th 101, 110 [96 Cal.Rptr.2d 441, 999 P.2d 666].)

The admission of other crimes evidence is governed by section 1101. "Subdivision (a) of section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393 [27 Cal.Rptr.2d 646, 867 P.2d 757], fn. omitted.) "The categories listed in section 1101, subdivision (b), are examples of facts that legitimately may be proved by other-crimes evidence, but . . . the list is not exclusive. [Citations.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 146 [109 Cal.Rptr.2d 31, 26 P.3d 357].) Hence, "[a]lthough evidence of prior offenses may not be introduced *solely* to prove criminal disposition or propensity such evidence may properly be admitted whenever it tends logically, naturally, and by reasonable inference to establish any fact material for the People or to overcome any material matter sought to be proved by the defense." (*People v. Montalvo* (1971) 4 Cal.3d 328, 331–332 [93 Cal.Rptr. 581, 482 P.2d 205], italics added.)

"[O]ther crimes evidence need be proven only by a preponderance of the evidence." (*People v. Steele* (2002) 27 Cal.4th 1230, 1245, fn. 2 [120 Cal.Rptr.2d 432, 47 P.3d 225].) "On appeal, we review a trial court's ruling [admitting evidence] under Evidence Code section 1101 for abuse of discretion." (*People v. Gray* (2005) 37 Cal.4th 168, 202 [33 Cal.Rptr.3d 451, 118 P.3d 496].)

> b. *The other crimes evidence was properly admitted to prove absence of accident, mistake, or suicide.*

Spector contends the trial court erred by admitting the other crimes evidence as tending to show what Clarkson might or might not have done with the gun, i.e., to show that her death had not been the result of accident, mistake, or suicide. This claim is meritless.

Although section 1101, subdivision (b), expressly allows other crimes evidence to be admitted "when relevant to prove some fact . . . such as . . . absence of mistake or accident," Spector argues that "neither case law nor logic permits the admission of evidence of uncharged offenses by a defendant to prove the conduct (or absence of conduct) of an alleged victim." He is wrong. In the appropriate circumstances, that is exactly what case law and logic do allow.

In this context, the word "accident" is used in two different senses: "One sense comes into play when the defendant admits performing an act but claims that he or she did so with innocent intent. The defendant confesses the actus reus but adds that he or she performed the act accidentally, inadvertently, or mistakenly." (1 Imwinkelried, Uncharged Misconduct Evidence (2009) § 4:3, pp. 4-41 to 4-42, fns. omitted.) In the second sense, "the defendant denies committing an actus reus. The defendant may concede that there was a loss such as fire or death, but the defendant claims that the cause of the casualty was not human agency." (*Id.* at p. 4-42, fns. omitted.)[13] "[T]he prosecutor may introduce evidence of uncharged misconduct . . . to negate accident in the second sense." (*Ibid.*)

Section 210 provides: " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." As will be explained, *post*, the other crimes evidence was relevant because it tended logically, naturally, and by reasonable inference to make it less likely Clarkson had shot herself either intentionally or accidentally, a fact the defense tried to prove. As a result, the other crimes evidence tended to establish both the corpus delicti of the charged offense,[14] and that Spector was responsible for the actus reus, facts the prosecution needed to prove.

---

[13] In this case, of course, the defense claim was that the cause of the casualty was not *his* human agency.

[14] "In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause. In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant. . . . [¶] . . . This rule is intended to ensure that one will not be falsely convicted, by his or her untested words alone, of a crime that never happened. [Citations.]" (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168–1169 [119 Cal.Rptr.2d 903, 46 P.3d 372], citations omitted.) If the defendant's extrajudicial statements are part of the prosecution's case, the trial court must instruct the jury on this corpus delicti principle. (*Id.* at p. 1170.) Spector's jury was instructed: "The defendant may not be convicted of any crime based on his out-of-court statement alone. You may only rely on the defendant's out-of-court statements to convict him if you conclude that other evidence shows that the charged crime or a lesser-included offense was committed. [¶] The other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed."

## (1) *Case law regarding absence of mistake or suicide.*

As our Supreme Court explained in *People v. Ewoldt, supra,* 7 Cal.4th 380, section 1101 codified existing law, specifically including a case in which other crimes evidence had been used to prove *the absence of conduct by a victim*: "[T]he Law Revision Commission comment, accompanying the original enactment of section 1101 in 1965 . . . explicitly noted that subdivision (b) of the statute was intended to codify existing law—including, specifically, the decision in *People v. Lisenba* [(1939)] 14 Cal.2d 403 [94 P.2d 569] . . . ." (*People v. Ewoldt, supra,* at pp. 399–400.)[15] In *People v. Lisenba* the body of the defendant's wife was found floating in their garden fishpond. Although she had suffered a snakebite, the evidence showed she died by drowning. At trial, an accomplice testified he and the defendant administered the snakebite but, when it did not kill the victim, they drowned her in a bathtub and put her body in the fishpond. Their aim had been to collect the proceeds of an insurance policy with a double-indemnity accidental death provision. The defendant testified and denied having had anything to do with his wife's death. The trial court admitted evidence showing that, three years earlier in Colorado, the defendant's first wife, who also had been insured with a double-indemnity provision, was drowned in a bathtub by the defendant so he could collect the insurance.

*Lisenba* held the trial court did not err by admitting evidence of the Colorado drowning. After enumerating the many similarities between the two deaths, the court explained: " '[T]he evidence of the Colorado incident was admissible not to prejudice the defendant by proof of the prior commission of another crime but as *tending to establish that the death of the deceased in the present action was not accidental, as it might at first appear, and as claimed by the defendant,* but was the result of a general plan or scheme on the defendant's part to insure, marry and murder his victims in order that he might thereby profit financially.' " (*People v. Lisenba, supra,* 14 Cal.2d at pp. 427–428, italics added.) Hence, *Lisenba* was a case where other crimes evidence was used *both* to prove the defendant's plan to murder his spouse for financial gain *and* to prove that what appeared to be an accidental death had actually been a homicide.

Here, Spector expressly tried to prove Clarkson had committed suicide, and implicitly raised the alternative defense that she might have shot herself

---

[15] *Ewoldt* quoted the Law Revision Commission as saying, " 'Section 1101 does not prohibit the admission of evidence of misconduct when it is offered as evidence of some other fact in issue, such as motive, *common scheme or plan,* preparation, intent, knowledge, identity, or absence of mistake or accident. Subdivision (b) of Section 1101 makes this clear. *This codifies existing law. People v. Lisenba . . . (prior crime admissible to show general criminal plan and absence of accident)* . . . .' (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1966 ed.) § 1101, p. 10, italics added.)" (*People v. Ewoldt, supra,* 7 Cal.4th at p. 400.)

accidentally. As in *Lisenba*, the other crimes evidence was relevant to disprove these theories about how Clarkson died.

In *People v. Catlin, supra*, 26 Cal.4th 81, our Supreme Court allowed the use of other crimes evidence to prove the corpus delicti in a case of paraquat poisoning, expressly rejecting the defendant's claim that "[c]ause of death . . . is not an appropriate object of proof for other-crimes evidence." (*Id.* at p. 145.) *Catlin* reasoned: "Evidence tending to demonstrate the cause of death was relevant to demonstrate that a murder—and not a natural death—had occurred. [Citations.] Evidence that defendant previously had murdered his [fifth] wife Glenna by poisoning her with paraquat *was relevant to the issue of the cause of death in the charged crimes*, because it tended to corroborate the other evidence establishing that [defendant's fourth wife] Joyce and [his mother] Martha died of paraquat poisoning." (*Id.* at p. 146, italics added; see also *People v. Ruiz* (1988) 44 Cal.3d 589, 606 [244 Cal.Rptr. 200, 749 P.2d 854] [murder cases properly joined where evidence that defendant killed Pauline, his fifth wife, was cross-admissible to prove he had also killed Tanya, his third wife (whose body was never found), because "Pauline's death was relevant to the critical issue whether Tanya too had died of some criminal agency."].)

The same reasoning has been applied in a case which did not involve a premeditated crime. In *People v. Zankich* (1961) 189 Cal.App.2d 54 [11 Cal.Rptr. 115], although there were witnesses to a barroom altercation between Zankich and Dr. Quattelbaum, his victim, nobody saw the defendant hit Quattelbaum, who died from a blow to the head, and there was only circumstantial evidence tending to show Zankich had hit Quattelbaum without provocation. On appeal from his second degree murder conviction, Zankich claimed the trial court should have excluded evidence he had committed several unprovoked batteries on other people in the 24 hours preceding his altercation with Quattelbaum. The trial court had admitted this other crimes evidence as "tending to show absence of provocation for the assault upon Dr. Quattelbaum and the infliction of same in a manner showing an abandoned and malignant heart." (*Id.* at p. 62.) In affirming Zankich's conviction, the Court of Appeal reasoned that evidence showing he had committed unprovoked assaults on two strangers within hours of the charged crime was "plainly proper as tending to prove *lack of provocation* for the assault on Dr. Quattelbaum . . . ." (*Id.* at p. 66, italics added.) *Zankich* was cited approvingly by *People v. Sam* (1969) 71 Cal.2d 194 [77 Cal.Rptr. 804, 454 P.2d 700], which described it as a case involving "evidence of other

unprovoked batteries within previous 24 hours *as proof of absence of provocation by victim* of present attack." (*Id.* at p. 206, fn. 2, italics added.)[16]

Hence, the other crimes evidence was admissible to prove that the cause of Clarkson's death had been neither an accident nor a suicide.

### (2) *Theory of logical relevance: the doctrine of chances.*

Spector argues that what he "did or did not do with Stephanie Jennings at the Carlyle Hotel in New York in the nineteen nineties had no tendency in reason to prove or disprove whether Lana Clarkson mistakenly discharged a gun in Alhambra, California in 2003. Likewise, nothing about Spector's conduct with Dian[n]e Ogden in the nineteen eighties had any tendency in reason to prove whether or not Ms. Clarkson was suicidal twenty years later." We disagree. As both case law and scholarly comment demonstrate, the other crimes evidence was logically relevant because of a principle known as the "doctrine of chances."

In *People v. Wells* (1949) 33 Cal.2d 330 [202 P.2d 53], disapproved on another ground in *People v. Wetmore* (1978) 22 Cal.3d 318, 321, 327, footnote 7 [149 Cal.Rptr. 265, 583 P.2d 1308], the defendant was a prison inmate accused of aggravated assault on a guard, allegedly because the guard had reported him for inmate rule infractions. The defendant, however, claimed he had hit the guard with a cuspidor by accident. In order to rebut the defendant's version of events, the trial court admitted evidence showing he had a 10-year history of run-ins with various prison guards. "The evidence of such other instances of misconduct was not admitted for the improper purpose of showing that defendant, because he had done many bad acts, was a bad person likely to do other bad acts, and, therefore, probably committed

---

[16] Spector asserts his case "is on all fours" with *People v. Deeney* (1983) 145 Cal.App.3d 647 [193 Cal.Rptr. 608], where the defendant and his wife had a loud argument one night and the following day she died of a brain hemorrhage. The defense theory was that the victim had fallen while drunk and died accidentally. Spector argues, "The court found that the admission of two instances of the defendant's past abuse of his wife was prejudicial error because the issue posed by the evidence was not whether the defendant's conduct in killing his wife was accidental, but whether the victim, an alcoholic, accidentally fell and caused her [own] fatal injuries." Spector has misconstrued this case. In fact, *Deeney* concluded that evidence the defendant had bruised his wife in the past, by dragging her through the grass, could have been admitted to counter defense evidence that witnesses had seen the wife accidentally fall on occasion, thus raising an inference those falls might have caused the bruises observed and, further, that it was likely she subsequently died in an accidental drunken fall. *Deeney* said, "*Therefore, the evidence of prior misconduct could have been admitted to rebut the assertion of accidental death.*" (*People v. Deeney, supra,* at p. 655, italics added.) *Deeney* went on to hold the prior misconduct evidence should not have been admitted, however, because its probative value was slight and the jury had not been properly instructed on its use. (*Id.* at p. 656.)

the crime charged. Rather, it was admitted in order that the jury, if they believed it, might draw the following proper series of inferences: Because defendant . . . expressed, by words and acts, feelings of hostility toward various custodial officers, he probably felt hostility and bore malice toward the class of custodial officers. Therefore, he probably was hostile to Brown, a member of the class against which his animosity was directed. Therefore, defendant probably injured Brown with 'malice aforethought' rather than by accident while engaged in actions prompted by honest fear for his own (defendant's) safety." (*People v. Wells, supra,* at pp. 341–342, fn. omitted.)

The theory of logical relevance underlying the result in cases like *Wells* has been called the "doctrine of chances." *U.S. v. Woods* (4th Cir. 1973) 484 F.2d 127, is considered to be a classic modern example of this theory. In *Woods,* a seven-month-old infant died in 1969 while in the defendant's custody after several unexplained instances of cyanosis or respiratory difficulty. The prosecution put on evidence to show that beginning in 1945 the defendant had either had custody of, or access to, nine other children who suffered similar symptoms, seven of whom died. According to *Woods*: "The evidence of what happened to the other children was not, strictly speaking, evidence of other crimes. . . . [W]ith regard to no single child was there any legally sufficient proof that defendant had done any act which the law forbids. Only when all of the evidence concerning the nine other children and Paul [(the current victim)] is considered collectively is the conclusion impelled that *the probability* that some or all of the other deaths, cyanotic seizures, and respiratory deficiencies were accidental or attributable to natural causes was so remote, the truth must be that Paul and some or all of the other children died at the hands of the defendant." (*Id.* at p. 133, italics added.) "[W]e think that the evidence would prove that a crime had been committed because of *the remoteness of the possibility* that so many infants in the care and custody of defendant would suffer cyanotic episodes and respiratory difficulties if they were not induced by the defendant's wrongdoing, and at the same time, would prove the identity of defendant as the wrongdoer." (*Id.* at p. 135, italics added.)

■ Professor Edward Imwinkelried has called *Woods* "the paradigmatic case" for showing how prior similar acts evidence and the doctrine of chances can be used to prove an actus reus: "In *Woods,* the accused . . . claimed that the [victim's] suffocation was accidental. To rebut the accused's claim, the prosecutor offered evidence that over a twenty-five year period, children in the accused's custody had experienced twenty cyanotic episodes. The defense objected to the admission of the testimony on the ground that the testimony amounted to impermissible evidence of the accused's bad character. However, the prosecution rejoined that the testimony was relevant on a noncharacter theory, that is, the doctrine of chances. [¶] . . . [W]hen the trier [of fact] engages in character reasoning, the initial decision facing the trier is

whether to infer from the evidence that the accused has a personal bad character. In contrast, under the doctrine of chances, the trier need not focus on the accused's subjective character. Under the doctrine of chances, the initial decision facing the trier is whether the uncharged incidents are so numerous that it is objectively improbable that so many accidents would befall the accused." (Imwinkelried, *The Use of Evidence of an Accused's Uncharged Misconduct to Prove* Mens Rea: *The Doctrines Which Threaten to Engulf the Character Evidence Prohibition* (1990) 51 Ohio St. L.J. 575, 586–587, fns. omitted.)

As Imwinkelried explained elsewhere: "Innocent persons sometimes accidentally become enmeshed in suspicious circumstances, but it is objectively unlikely that will happen over and over again by random chance." (Imwinkelried, *An Evidentiary Paradox: Defending the Character Evidence Prohibition by Upholding a Non-Character Theory of Logical Relevance, The Doctrine of Chances* (2006) 40 U.Rich. L.Rev. 419, 423.) "The doctrine does not ask the jurors to utilize the defendant's propensity as the basis for a prediction of conduct on the alleged occasion. Instead, the doctrine asks the jurors to consider the objective improbability of a coincidence in assessing the plausibility of a defendant's claim that a loss was the product of an accident or that he or she was accidentally enmeshed in suspicious circumstances." (*Id.* at p. 439.)

"There is broad consensus that similar acts evidence may be introduced on a doctrine of chances rationale to prove the defendant committed an actus reus when the defendant asserts that he did not cause the . . . harm . . . . This type of evidence is admitted under several of the familiar category labels— absence of mistake or accident, modus operandi, or plan or scheme—but probability based reasoning underlies its relevance." (Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape:* People v. Ewoldt *Reconsidered* (1996) 29 U.C. Davis L.Rev. 355, 386, fn. omitted.) "Wives sometimes accidently drown in bathtubs. But it does not happen often, and the likelihood of the same man losing three wives in accidental bathtub drownings [a reference to the English case, *Rex v. Smith* (1915) 11 Crim.App. 229 [84 L.J.K.B. 2153]] is extremely remote. The fact that is being proven, the defendant's commission of the criminal act, is established indirectly through a process of elimination. Once the possibility of accident is rendered unlikely, the most plausible explanation for the harm's occurrence is that the defendant caused it." (*Id.* at pp. 388–389, fns. omitted.)

California cases have recognized the value of this probability-based calculation that arises from a history of prior similar acts. As *Matthews v. Superior Court* (1988) 201 Cal.App.3d 385 [247 Cal.Rptr. 226], commented: *Woods* "reasoned an unmistakable pattern emerged when the incidents were considered collectively." (*Id.* at p. 396 [where victim's skeletal remains were

insufficient to prove sexual assault, evidence of two prior rapes was properly admitted to establish corpus delicti at preliminary hearing on charge of murder during commission of rape]; see also *People v. Kelly* (2007) 42 Cal.4th 763, 786 [68 Cal.Rptr.3d 531, 171 P.3d 548] ["It would have been a remarkable coincidence if, shortly after defendant violently assaulted two women he befriended at the fitness center, some different person happened to use that same apartment to assault another woman defendant had befriended at the fitness center."]; *People v. Steele, supra*, 27 Cal.4th at p. 1244 ["[T]he doctrine of chances is based on a *combination* of similar events" and it "teaches that the more often one does something, the more likely that something was intended, and even premeditated, rather than accidental or spontaneous. Specifically, the more often one kills, especially under similar circumstances, the more reasonable the inference the killing was intended and premeditated."].)

In *People v. Carpenter* (1997) 15 Cal.4th 312 [63 Cal.Rptr.2d 1, 935 P.2d 708], disapproved on another ground in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1105–1106 [77 Cal.Rptr.3d 287, 183 P.3d 1250], our Supreme Court cited both Imwinkelried (Uncharged Misconduct Evidence § 4:01) and Wigmore on the subject: " 'The reasoning underlying use of an actor's prior acts as circumstantial evidence of that actor's later intent is well explained by Wigmore [(2 Wigmore, Evidence (Chadbourn ed. 1979) § 302, p. 241)]. It is based on "the doctrine of chances—the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all. Without formulating any accurate test, and without attempting by numerous instances to secure absolute certainty of inference, the mind applies this rough and instinctive process of reasoning, namely, that an unusual and abnormal element might perhaps be present in one instance, but that the oftener similar instances occur with similar results, the less likely is the abnormal element likely to be the true explanation of them." ' " (*People v. Carpenter, supra*, at p. 379.)

Here, the other crimes evidence consisted of seven separate incidents in which Spector committed armed assaults against women in very specific circumstances, which will be discussed more fully, *post*. To the extent the circumstances of Clarkson's death were similar to those prior armed assaults, the latter evidence, without any improper reliance on Spector's bad character or propensities, tended to prove the objective improbability that Clarkson had either committed suicide or killed herself accidentally. This is because the evidence tended to show, by operation of the doctrine of chances, the unlikelihood that this time it was the woman, not Spector, who reached for a gun.

We conclude the trial court did not abuse its discretion by admitting the other crimes evidence to prove Clarkson did not die by her own hand.

 c. *The other crimes evidence was properly admitted to prove motive.*

Spector contends the trial court erred by admitting the other crimes evidence as tending to prove motive. This claim is meritless.

■ Section 1101, subdivision (b), expressly allows other crimes evidence to be admitted "when relevant to prove some fact . . . such as motive . . . ." Spector asserts, however, that in order to use other crimes evidence to show motive "controlling Supreme Court precedent . . . requires a direct nexus between the uncharged offense and the charged crime such that the former provides a clear reason to commit the latter." Spector is incorrect.

Other crimes evidence is admissible to establish two different types or categories of motive evidence. In the first category, "the uncharged act supplies the motive for the charged crime; the uncharged act is cause, and the charged crime is effect." (1 Imwinkelried, Uncharged Misconduct Evidence, *supra*, § 3:18, p. 3-128.) "In the second category, the uncharged act evidences the existence of a motive, but the act does not supply the motive. . . . [T]he motive is the cause, and both the charged and uncharged acts are effects. *Both crimes are explainable as a result of the same motive.*" (*Id.* at pp. 3-128 to 3-129, fns. omitted, italics added.)

California case law allows the admission of other crimes evidence to prove this second kind of motive. (See *People v. Davis* (2009) 46 Cal.4th 539, 604 [94 Cal.Rptr.3d 322, 208 P.3d 78] [evidence of two prior sexual assaults on children involving bondage tended to show defendant had motive for sexually assaulting murder victim]; *People v. Demetrulias* (2006) 39 Cal.4th 1, 15 [45 Cal.Rptr.3d 407, 137 P.3d 229] [evidence of prior assault and robbery of different victim tended to show defendant had motive to rob victim killed in current case]; *People v. Walker* (2006) 139 Cal.App.4th 782, 803 [43 Cal.Rptr.3d 257] [in trial for murdering prostitute, evidence of prior sexual assaults tended to show defendant's " 'common motive of animus against prostitutes resulting in violent batteries interrupting completion of the sex act' "]; *People v. Pertsoni* (1985) 172 Cal.App.3d 369, 375 [218 Cal.Rptr. 350] [in trial for murdering man affiliated with Yugoslav government, evidence defendant had previously shot at person he thought was Yugoslavian

ambassador tended to show that defendant's hatred of Yugoslav government impelled him to kill current victim].)[17]

Spector cites our decision in *Hassoldt v. Patrick Media Group, Inc.* (2000) 84 Cal.App.4th 153 [100 Cal.Rptr.2d 662], for the proposition that "other offense evidence is admissible as proof of motive only if the identity of the actor is not in dispute and that, if that identity is in dispute, the other-offense evidence is admissible only if it meets the most stringent test for admissibility under an identity theory . . . ." But in the case at bar the identity of *all* possible actors was known, because either Spector or Clarkson had to have fired the gun, whereas in *Hassoldt* there was an unknown perpetrator issue.[18] Moreover, Spector mistakenly relies on our statement "that where the identity of the actor is in dispute and the uncharged misconduct fails to satisfy the stringent 'so unusual and distinctive as to be like a signature' standard enunciated in *Ewoldt*, the uncharged conduct is not admissible on such issues as intent, motive or lack of mistake or accident . . . ." (*Hassoldt, supra,* at p. 166.) *People v. Foster* (2010) 50 Cal.4th 1301 [117 Cal.Rptr.3d 658, 242 P.3d 105], has since clarified that this is incorrect. (See *id.* at p. 1332 ["Defendant contends . . . the evidence could not be admitted for a purpose other than identity if the identity of the perpetrator was in dispute. We have rejected this argument."].)

In a related argument, Spector complains about the way the trial court defined "motive" for the jury. The trial court told the jurors that, if they decided Spector had committed the uncharged crimes, they could "consider that evidence for the limited purpose of: [¶] Determining whether the defendant had a motive to commit the offenses alleged in this case. For the purposes of this instruction, *motive is an emotion that may impel or incite a person to act in accordance with his state of emotion.*" (Italics added.) Spector characterizes this as a "novel definition" that "is wholly at odds with the term's legal definition in the context of section 1101(b) evidence."

██ We disagree. As Justice Jefferson explained: " '[W]hen the commission of a criminal act [[(the crime for which defendant is on trial)] is a

---

[17] Spector's citation of purportedly contradictory case law is unpersuasive. *People v. Daniels* (1991) 52 Cal.3d 815 [277 Cal.Rptr. 122, 802 P.2d 906], was simply a classic category one motive case where evidence showed that because the police had rendered the defendant a paraplegic during an earlier crime, the defendant was motivated to subsequently murder other police officers in revenge. Both *People v. Walker, supra,* 139 Cal.App.4th 782, and *People v. Scheer* (1998) 68 Cal.App.4th 1009 [80 Cal.Rptr.2d 676], acknowledged the legitimacy of category two motive evidence although they characterized it as "common plan" evidence. (See *People v. Walker, supra,* at p. 804.) The problem in *Scheer,* where the defendant was on trial for voluntary manslaughter arising out of a traffic accident, was that there had been only *one* other incident and it was not particularly similar.

[18] In *Hassoldt* there was a genuine factual issue as to whether the defendant outdoor advertising company had trimmed the plaintiffs' tree.

disputed issue, evidence of *motive* may become relevant to that issue. Motive is itself a state-of-mind or state-of-emotion fact. Motive is an idea, belief, or emotion that impels or incites one to act in accordance with his state of mind or emotion. Thus, evidence, offered to prove motive, that defendant committed an uncharged offense meets the test of relevancy by virtue of the circumstantial-evidence-reasoning process that accepts as valid the principle that one tends to act in accordance with his state of mind or emotion.' (Jefferson, Cal. Evidence Benchbook (1978 supp.) Special Problems Related to Relevancy, § 21.4, p. 218.) (Italics added.)" (*People v. Pic'l* (1981) 114 Cal.App.3d 824, 855–856 [171 Cal.Rptr. 106], disapproved on another ground in *People v. Kimble* (1988) 44 Cal.3d 480, 498 [244 Cal.Rptr. 148, 749 P.2d 803]; see also *People v. Gibson* (1976) 56 Cal.App.3d 119, 128 [128 Cal.Rptr. 302] [in another opinion Justice Jefferson stated: "section 1101, subdivision (b) makes *admissible* the other-crimes evidence when relevancy is predicated on a state-of-mind or state-of-emotion fact which, in turn, leads to an inference of the existence of that same state-of-mind fact at the time of the charged offense, or, that defendant acted in accordance with his state of mind and committed the charged offense"].)

As the Attorney General points out, Justice Jefferson's definition is consistent with the common dictionary definition of motive. (See, e.g., Merriam-Webster <http://www.merriam-webster.com/dictionary/motive> [as of May 2, 2011] [defining motive as "something (as a need or desire) that causes a person to act"]; American Heritage Dict. (1973) pp. 856–857 [defining motive as "An emotion, desire, psychological need, or similar impulse acting as an incitement to action."].)

The Attorney General argues the other crimes evidence in this case was admissible because it tended to show Spector had acted with the same state of mind or "state of emotion" in both the charged and the uncharged offenses: "The prior assault evidence supplied the reason *why* appellant would have killed Clarkson, and thus had high probative value, under this second, 'similar crime' category [of motive evidence]. The record reveals defining similarities between appellant's assault on Clarkson and his prior assaults on Melvin, Jennings, Robitaille, Ogden, and Grosvenor. In each of these prior incidents, (1) appellant was alone with a woman whom he had invited to his house or hotel, (2) appellant had a romantic or sexual interest in her, (3) appellant drank alcohol, (4) appellant exhibited romantic or sexual behavior with her, (5) she attempted to leave, (6) appellant lost control, (7) appellant threatened her and pointed his accessible gun at her, and (8) appellant blocked or locked the door to force her to stay against her will."[19]

---

[19] Some of the testimony did not precisely match these characterizations. For instance, Melvin was not trying to leave at first but was apparently trying to stop Spector from shooting

In addition to the factors cited by the Attorney General, it appears to us there are two other similarities which particularly resonate with Justice Jefferson's notion of motive as a state of mind or a state of emotion that incites a person to action. In every one of the seven assaults, Spector was extremely angry or enraged.[20] And during five of the seven incidents, Spector manifested a significant mood swing.[21] Hence, there was evidence Spector had exhibited an extremely heightened emotional state during these prior assaults.

We agree with the Attorney General the evidence also tended to show that some of these same factors were present during Spector's encounter with Clarkson. This evidence includes the following: Spector was apparently looking for some sort of romantic or sexual female companionship that night. After he had Sullivan driven home,[22] he asked Holguin, the cocktail waitress at the House of Blues, to come home with him. She turned him down. At that point, Spector turned his attention to Clarkson, who agreed to go with him. The evidence showed Spector drank a substantial amount of alcohol that night. There was evidence some intimate or sexual activity had taken place during the two hours Clarkson spent at Spector's house. When she was shot, Clarkson was sitting in a foyer near the rear door of Spector's house, just a few feet from where De Souza was sitting in the Mercedes waiting to drive her home. Clarkson's purse was apparently slung over her shoulder in preparation for leaving. As the Attorney General argues: "Under these circumstances, the jury could permissibly infer that appellant similarly lost control and shared the same motive in this incident as in the seven prior incidents with the five other women."

---

at her car. And although Spector then ordered Melvin back into the house, he later ordered her to leave. However, the slight differences in detail were not material.

[20] Melvin testified Spector screamed at her. Jennings testified Spector was angry and yelling. Robitaille described Spector during the first incident as a shouting maniac, and in the second incident as angry and shouting, with his veins bulging. Ogden testified Spector screamed at her during both incidents. Grosvenor described Spector as irate.

[21] Melvin testified Spector suddenly became calm again, and said he would open the gate, only a moment after chasing her with a shotgun. Robitaille testified that during the first incident Spector's demeanor suddenly changed and he "became himself again." Robitaille testified that during the second incident Spector exhibited a sudden change of mood. Ogden testified Spector seemed to have become demonic, that he was "not being him." Grosvenor testified Spector's whole demeanor changed.

[22] Based on Sullivan's testimony, the jury might have concluded Spector's interest in her was not romantic or sexual because she said he had always treated her in a fatherly fashion. On the other hand, the jury could have found Sullivan was a less than completely credible witness because she testified Spector did not tell her to "just order a fucking drink" at the House of Blues, but Holguin directly contradicted that testimony.

We conclude the trial court did not abuse its discretion by admitting the other crimes evidence to show motive and that the trial court's jury instruction defining motive was not erroneous.

### d. *Trial court did not mishandle the "identity" question.*

Spector contends the trial court committed both procedural and substantive error when it instructed the jury the other crimes evidence could be used to establish "that the death of Lana Clarkson was not the result of accident, mistake, or suicide, *but rather that the defendant was the person who committed the offense alleged in this case.*" (Italics added.) In essence, Spector claims the trial court erroneously admitted the other crimes evidence to prove identity. This claim is meritless.

#### (1) *Spector's claim of substantive error is meritless.*

Spector claims this instruction was erroneous because the other crimes evidence "did not meet the 'distinctive signature' test required by" *Ewoldt* to prove a perpetrator's identity. But this claim is predicated on the mistaken notion one of the disputed issues at trial must have been "identity" because the key question was whether Spector or Clarkson had fired the gun. The issue in this case, however, was not the classic identity question that arises when there is an undisputed actus reus but the perpetrator is unknown. Rather, the key question for the jury was whether there had been an actus reus at all, i.e., whether Clarkson's death had been a homicide or whether she had taken her own life, either intentionally or accidentally. If there had been an actus reus, then the identity of the perpetrator was not in doubt because the perpetrator had to be Spector.

As the Attorney General notes, "When read in context, the second clause—'but rather that the defendant was the person who committed the offense alleged in this case'—did not relate to identity, but was connected to the first clause—'establishing that the death of Lana Clarkson was not the result of accident, mistake, or suicide.' The second clause properly explained the only reasonable inference from finding that Clarkson's death did not result from her accident, mistake, or suicide. If Clarkson did not die by one of these three means, then appellant killed her, and this is all the trial court's instruction conveyed." Spector's theory at trial was there had been no actus reus because Clarkson shot herself. The trial court's instruction fairly presented this issue to the jury.

#### (2) *Spector's claim of procedural error is meritless.*

Spector contends the trial court erred by not finalizing the language of this jury instruction until after defense counsel had already finished summing up

to the jury, and that this violated Spector's right to present a complete closing argument. (See *Herring v. New York* (1975) 422 U.S. 853, 858 [45 L.Ed.2d 593, 95 S.Ct. 2550] [defense counsel "has a right to make a closing summation to the jury"]; *U.S. v. Gaskins* (9th Cir. 1988) 849 F.2d 454, 458–460 [conviction reversed because trial court instructed jury on new aiding and abetting theory of liability during deliberations, and defense counsel's closing argument had only addressed direct perpetrator theory].)

Spector argues the contested instructional language was "proposed by the prosecution only *after* the defense completed its closing argument [and] expanded the grounds upon which the uncharged offense evidence could be considered by the jury. In *People v. Armstead* (2002) 102 Cal.App.4th 784 [125 Cal.Rptr.2d 651], the court reversed convictions on several counts because of a similar error." But *Armstead* is inapposite. In that case, the trial court decided, after the jury had already begun deliberating, that evidence which had been admitted only to prove charged counts could also be used by the jury as other crimes evidence, despite there having been no discussion of admitting the evidence for that purpose. Here, as discussed *ante*, the question of "identity" and the question of "absence of accident, mistake or suicide" were always two sides of the same coin. Nothing new was added.

Moreover, the record indicates the final language of the instruction was within the parameters discussed by the parties and approved by the trial court. Defense counsel objected to the final language by saying: "There's no limitation in this instruction. There's no focus in this instruction, not any permissible purpose. It is simply 'is he guilty?' And what the prosecution has now done with his proposed amendment is to make that problem even more glaring by adding the phrase 'but, rather, the defendant was the person who committed the offense alleged in this case.' "

The following colloquy then occurred:

"[The prosecutor]: It was litigated, Your Honor, several times, and it is within the parameters of the court's ruling. . . .

"The Court: It says exactly what it means to say. We did discuss this, and that the whole idea is it's just saying the obvious, because when you have a case, an unusual case such as this, where the contention is, is it a suicide, or is it a murder, if you disprove suicide, by necessity, he becomes the person who did it. . . . The whole idea of this, we have discussed it at length now. It's not a general, use it for any purpose. I completely disagree [(i.e., with defense counsel's argument)], and the language tracks just exactly what I had in mind."

Spector also argues the instructional language amounted to an unlawful mandatory or rebuttable presumption. Not so. The language properly set forth the only two factual possibilities faced by the jury: either Clarkson shot herself, or Spector shot her. It was undisputed at trial that *if* Clarkson did not shoot herself, *then* Spector shot her.

We conclude the trial court did not mishandle the identity question.

> e. *Trial court did not err by finding the other crimes evidence more probative than prejudicial.*

Spector contends the trial court erred by admitting the other crimes evidence because, under section 352, this evidence was more prejudicial than probative. We disagree.

> (1) *Legal principles.*

■ "Our conclusion that section 1101 does not require exclusion of the evidence of defendant's uncharged misconduct, because that evidence is relevant to prove a relevant fact other than defendant's criminal disposition, does not end our inquiry. Evidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis. [Citations.]' [Citations.] 'Since "substantial prejudicial effect [is] inherent in [such] evidence," uncharged offenses are admissible only if they have *substantial* probative value.' [Citation.] [¶] . . . We thus proceed to examine whether the probative value of the evidence of defendant's uncharged offenses is 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.)" (*People v. Ewoldt, supra,* 7 Cal.4th at p. 404.)

" '[W]hen an objection to evidence is raised under Evidence Code section 352, the trial court is required to weigh the evidence's probative value against the dangers of prejudice, confusion, and undue time consumption. Unless these dangers "substantially outweigh" probative value, the objection must be overruled. [Citation.] On appeal, the ruling is reviewed for abuse of discretion.' [Citation.]" (*People v. Jenkins* (2000) 22 Cal.4th 900, 1008 [95 Cal.Rptr.2d 377, 997 P.2d 1044].)

> (2) *The other crimes evidence was probative.*

Spector argues the other crimes evidence should have been excluded under section 352 because it .had "no probative value other than through the impermissible inference that, because the defendant had a particular character trait, he was more likely to have killed Clarkson." He asserts: "The *only* way

that the uncharged acts made it more likely that he assaulted Lana Clarkson was by a 'history' showing Spector to be the kind of person who would do so. In other words, the state's theory of admissibility requires *precisely* the inference from propensity to guilt that § 1101(a) prohibits."

As we have explained, *ante*, Spector is wrong. The inculpatory inferences raised here were based on a far more specific foundation than the mere proposition Spector hates women and tends to assault them with guns. Rather, the evidence showed Spector had a history of committing armed assaults against women in very particular circumstances. The evidence showed that, when fueled by alcohol and faced with a lack or loss of control over a woman who was alone with him and in whom he had a romantic or sexual interest, Spector underwent a sharp mood swing, exhibited extreme anger, and threatened the woman with a gun when she refused to do his bidding. This evidence was properly admitted under section 1101, subdivision (b), for the nonpropensity purpose of showing (1) Spector's motive for committing an armed assault that might have resulted in an implied malice murder and (2) absence of accident or suicide on the part of Clarkson. Both theories made it more likely Spector had fired the gun, and less likely that Clarkson had used it to kill herself.

To paraphrase *Ewoldt*: "The principal factor affecting the probative value of the evidence of defendant's uncharged offenses is the tendency of that evidence to demonstrate the existence of [motive or absence of accident, mistake or suicide]. That tendency is strong [here]." (*People v. Ewoldt, supra,* 7 Cal.4th at p. 404.)

### (3) *The evidence was not too remote.*

 Against the strong probative value of this evidence, Spector argues it was prejudicial because it was too remote. The gun assaults occurred in 1975 (Robitaille), 1986 (Robitaille), 1989 (Ogden), 1993 (Melvin), 1993 (Grosvenor), and 1995 (Jennings). This means the most recent incident occurred eight years before Clarkson's death, and the oldest occurred 28 years before. However, "[n]o specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible." (*People v. Branch* (2001) 91 Cal.App.4th 274, 284 [109 Cal.Rptr.2d 870].) And similar time periods have been approved in other cases. (See *People v. Ing* (1967) 65 Cal.2d 603, 612 [55 Cal.Rptr. 902, 422 P.2d 590], questioned on other grounds in *People v. Tassell* (1984) 36 Cal.3d 77, 89 [201 Cal.Rptr.

567, 679 P.2d 1] [15 years before charged offenses]; *People v. Branch, supra*, 91 Cal.App.4th at pp. 284–285 [more than 30 years]; *People v. Waples* (2000) 79 Cal.App.4th 1389, 1395 [95 Cal.Rptr.2d 45] [18 to 25 years].)

Moreover, in this case there were not just one or two incidents from long ago, but a series of seven prior firearm assaults stretching over some 20 years, beginning in 1975 with Devra Robitaille and continuing through Stephanie Jennings in 1995. As the Attorney General argues, "The fact that the similar assaults had recurred over a lengthy period added to their probative value."

### (4) *The evidence was not too inflammatory.*

Spector argues the other crimes evidence should have been excluded because it was too inflammatory. But the other crimes evidence was less inflammatory than the charge he was facing because Spector never killed anyone during the prior incidents. Indeed, he never even fired a gun during the prior incidents. (See *People v. Ewoldt, supra*, 7 Cal.4th at p. 405 [potential for prejudice was *decreased* where evidence "describing defendant's uncharged acts . . . was no stronger and no more inflammatory than the testimony concerning the charged offenses"]; *People v. Kipp* (1988) 18 Cal.4th 349, 372 [75 Cal.Rptr.2d 716, 956 P.2d 1169] [risk of prejudice "was not unusually grave" where the prior "crimes were not significantly more inflammatory than the [current] crimes"]; *People v. Yovanov* (1999) 69 Cal.App.4th 392, 406 [81 Cal.Rptr.2d 586] [evidence of prior child molestations was not highly inflammatory where "the evidence concerning the charged offenses was equally graphic"].)

Spector argues that, "though the *charge* of murder is more inflammatory than that of brandishing a firearm, given the dearth of evidence that Spector had actually *committed* a murder, the imbalance in the gravity of the comparative putative charges hardly diminishes the prejudice he suffered." Spector seems to be forgetting De Souza testified he saw Spector walk out the back door of the house with a gun in his hand and heard Spector confess to having just killed someone. Spector also seems to be forgetting De Souza consistently told the same basic story five different times over the next several hours.

### (5) *It does not matter if Spector's acts were not completely premeditated.*

Spector argues the fact the other crimes evidence did not involve premeditated acts made it less probative, citing a statement in *U.S. v. San Martin* (5th Cir. 1974) 505 F.2d 918, 923, that "evidence of prior crimes involving

intent of the moment are [*sic*] hardly ever probative of later acts involving similarly split-second intent" because "such prior crimes have less to do with the type of specific intent that may arise later . . . than they do with the defendant's overall disposition or character . . . ."

In the circumstances of this case, however, *San Martin*'s point constitutes a somewhat artificial distinction. Even assuming Spector's actions were spontaneous, in the sense that at the beginning of each encounter he had not already planned to assault these women, but only did so in reaction to evolving situations, surely there was always a significant volitional element to what he did. That is, there came a moment in each encounter when Spector made a decision he was going to deal with the situation by procuring a gun and threatening to use it. Indeed, on no occasion did Spector simply whip out a gun he happened to be carrying on his person. Rather, he left the women alone while he went elsewhere in his house or back to his hotel room to procure the weapon.

> (6) *On balance, the other crimes evidence was more*
> *probative than prejudicial.*

Spector properly points out that, because no punishment was ever imposed for the uncharged gun assaults, there is a possibility the jury could have been motivated to use the evidence of those assaults as a reason to punish him. As explained by *People v. Ewoldt, supra,* 7 Cal.4th at page 405: "[T]he prejudicial effect of this evidence is heightened by the circumstance that defendant's uncharged acts did not result in criminal convictions. This circumstance increased the danger that the jury might have been inclined to punish defendant for the uncharged offenses, regardless whether it considered him guilty of the charged offenses . . . ."

But this was the only factor weighing against admissibility, and the trial court could have rightly concluded this single factor was insufficient to tip the balance against admitting the evidence.

In sum, we cannot say the trial court abused its discretion by concluding the probative value of the other crimes evidence outweighed its possible prejudicial impact under section 352. "Evidence of uncharged crimes is inherently prejudicial but may still be admitted if it has substantial probative effect. [Citation.] The matter lies within the discretion of the trial court. [Citations.] The ruling here was well within the court's discretion." (*People v. Carpenter, supra,* 15 Cal.4th at p. 380.)

### f. *Trial court properly allowed the prosecution to argue "pattern."*

Spector contends the trial court erred by allowing the prosecution, during closing argument, to assert the other crimes evidence demonstrated a "pattern" of violence and misogyny by Spector, because "[a]sserting that a defendant has a 'pattern' of violent conduct is indistinguishable from arguing that he or she has a propensity or character trait for violence." We disagree.

In *People v. Cavanaugh* (1955) 44 Cal.2d 252 [282 P.2d 53], other crimes evidence showing the defendant had beaten a casual drinking acquaintance in order to carry out a robbery was held to be relevant evidence in the defendant's trial for murdering a second casual drinking acquaintance. *Cavanaugh* reasoned: "[W]hile it is often said that evidence of similar crimes is relevant to show plan, scheme, system, or design, this is not to be understood as meaning that such evidence is admissible only if it tends to show premeditated, calculated design; it also is relevant and may be admissible where, as here, it tends to show that defendant was guilty of the crime charged by showing a peculiar or characteristic *behavior pattern* of defendant which is manifest in the conduct of the transgressor in both crimes. [Citation.]" (*Id.* at pp. 265–266, italics added.)[23]

*People v. Kelly, supra,* 42 Cal.4th 763, held other crimes evidence showing the defendant raped and robbed a series of women he had lured to his home was properly admitted to prove his intent to rob and rape the murder victim. "Defendant discusses each act in isolation and argues it should not have been admitted. But each act did not occur in isolation but as *part of a larger pattern*, a pattern that was highly relevant to understanding what happened to [the victim]." (*Id.* at p. 785, italics added.) "[D]efendant's pattern of raping (as well as robbing) women he lured to his home under similar circumstances provides ample evidence for a reasonable jury to find that defendant intended to rape Sara when he killed her. *Nothing* in this case *required the jury to find that Sara was an exception to the pattern*, and that defendant had no sexual intent when he lured Sara to his home." (*Id.* at p. 789, italics added.)

---

[23] The pattern in *Cavanaugh* was this: "In each case there is evidence tending to show that defendant viciously attacked and robbed a victim with whom he had become acquainted when they drank together in a bar; in each case defendant told a rather implausible story of his drinking companion being in the car for a short time with a girl or girls whom he and defendant had 'picked up' and of defendant returning to the car to find the victim bloody and beaten; and in each instance defendant was thereafter in possession of property of the victim." (*People v. Cavanaugh, supra,* 44 Cal.2d at p. 265.)

We agree with the Attorney General the evidence presented at trial showed Spector's "conduct fit a pattern, that is, when confronted with a specific set of circumstances, [Spector] acted in a particular way." To paraphrase *Kelly*: "[Clarkson's] death did not occur in a vacuum. She did not survive her encounter with defendant to tell her story. But, fortunately, many others— [Melvin, Jennings, Robitaille, Ogden and Grosvenor]—did survive and can tell their tales. Their testimony was critical to the jury's full understanding of the circumstances of [Clarkson's] death. The pattern their testimony established helped the jury to understand how and why [Clarkson] came to be [shot in the foyer of Spector's house] on that fatal occasion." (*People v. Kelly, supra*, 42 Cal.4th at p. 785.)

In this case, the trial court characterized the evidence as demonstrating a "continuing pattern," a decades-long pattern, of "violence toward women." When Judge Fidler ruled the prosecution could make the "pattern" argument to the jury, he noted that initially he was unsure it would be proper, but then he read *Kelly*: "Pattern does get close to propensity, but, very clearly, the Supreme Court says you can use that, and I'm satisfied in this case that is appropriate." We agree with the trial court's reasoning and conclude it did not err by allowing the prosecution to make this argument to the jury.

 3. *There was no error arising from the admission of the generic threat evidence.*

Spector contends the trial court erred by admitting generic threat evidence, under section 1250 (evidence of declarant's then existing state of mind), in the form of Vincent Tannazzo's testimony. This claim is meritless.

 a. *The generic threat evidence.*

Vincent Tannazzo testified that, after retiring from the New York City Police Department, he started a private security company. One of his clients was Joan Rivers. Tannazzo was acquainted with Dorothy Melvin because she was Rivers's manager, and he knew Melvin had been dating Spector. Sometime between 1991 and 1994, while providing security for a Christmas party hosted by Rivers, Tannazzo was stationed in the lobby of her New York City apartment building, checking visitors against the guest list. At one point during the party, Melvin telephoned Tannazzo and said, "Vinnie, get up here. Phillip Spector just pulled out a gun." Tannazzo unholstered his own gun, put it into his jacket pocket, and took the elevator up to Rivers's apartment.

When the elevator door opened, Tannazzo saw Spector and Melvin arguing. Spector was "out of control" and he "kept saying these fucking cunts, these fucking cunts, over and over again." Melvin was telling Spector to calm down. Tannazzo did not think Spector was directing his anger at Melvin. The three of them got into the elevator. On the ride down to the lobby, Tannazzo unobtrusively patted Spector down for weapons and felt a revolver in Spector's waistband underneath his jacket. Spector was still ranting and saying "cunt." Tannazzo testified that when they reached the lobby, "Spector was still ranting the 'C' word and Dorothy Melvin told me . . . 'Vinnie, put him in a car, get him out of here.' " At one point, Tannazzo thought Spector was reaching for his gun. Tannazzo told him "if he pulled out that gun I'd blow his fucking brains out." Spector replied, "I'm cool, I'm cool. I love cops. . . . All I want is my keyboard."

Tannazzo and Spector went outside to Spector's limousine and sent the driver to retrieve the keyboard from Rivers's apartment. While waiting for the driver to return, Spector showed Tannazzo a gun permit and said, "I have permits for all over the place. Everywhere I go, I carry a piece." Then Spector said, "These fucking cunts, they all deserve a bullet in their heads." Asked if Spector appeared to be joking, Tannazzo testified, "Oh, absolutely not." When the driver returned with the keyboard, Spector left.

One year later, Tannazzo was again working security for Joan Rivers's annual Christmas party. Spector and Melvin arrived separately. Later, the elevator doors opened in the lobby and Melvin and Spector walked out, arguing. Spector "kept saying, 'That fucking cunt, that fucking cunt, that fucking cunt' over and over again." He was yelling and out of control. He did not appear to be yelling at Melvin, who was trying to calm him down. Melvin told Tannazzo to get Spector out of there. As they were leaving the lobby, the elevator doors opened and a woman walked out. Spector looked at her, took a couple of steps toward her, and "yelled, 'That fucking cunt, I ought to put a bullet in her head right now.' " Tannazzo forcibly removed Spector from the building and put him into his limousine.

### b. *Legal principles.*

Section 1250 (statement of declarant's then existing mental or physical state) provides, in pertinent part: "(a) Subject to Section 1252, evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind,

emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." Section 1252 provides: "Evidence of a statement is inadmissible under this article if the statement was made under circumstances such as to indicate its lack of trustworthiness."

■ Evidence of a *generic threat* is admissible "where other evidence brings the actual victim within the scope of the threat." (*People v. Rodriguez* (1986) 42 Cal.3d 730, 757 [230 Cal.Rptr. 667, 726 P.2d 113] [defendant's threat to kill any police officer who tried to arrest him was admissible to show homicidal intent in trial for subsequently murdering two CHP officers]; see also *People v. Lang* (1989) 49 Cal.3d 991, 1015 [264 Cal.Rptr. 386, 782 P.2d 627] [defendant's threat to " 'waste any mother fucker that screws with me' " was admissible to show he killed victim intentionally and not in self-defense].) ■ "A defendant's threat against the victim . . . is relevant to prove intent in a prosecution for murder. [Citation.] The statements here in question did not specify a victim or victims but were aimed at any police officer who would attempt to arrest appellant. Such a generic threat is admissible to show the defendant's homicidal intent where other evidence brings the actual victim within the scope of the threat." (*People v. Rodriguez, supra*, at p. 757.)

■ In *People v. Karis* (1988) 46 Cal.3d 612 [250 Cal.Rptr. 659, 758 P.2d 1189], there was evidence that, three days before allegedly kidnapping two women, raping one and then shooting both, the defendant had told someone "he would not hesitate to eliminate witnesses if he committed a crime." (*Id.* at p. 634.) *Karis* held this purely hypothetical threat was admissible under section 1250: "Jefferson explains the relevance of a declarant's statement of intent: 'A statement of a declarant's intention to do certain acts or engage in certain conduct is admissible to prove that he did those acts or did engage in that conduct. This is an example of both direct and circumstantial evidence. Declarant's statement of his intention is direct evidence of the fact of his state of mind. The fact of his state of mind—to wit, his intention—becomes proof that declarant acted or conducted himself in accordance with his intention as an element of his state of mind. It is an accepted principle of circumstantial evidence that a person's conduct or acts may be inferred from proof of that person's state of mind.' (1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 14.1, p. 384.)" (*People v. Karis, supra*, at p. 636, fn. 17.)

■ Noting the similar danger inherent in the kind of pure propensity evidence prohibited by section 1101, subdivision (a), *Karis* cautioned: "Evidence of a defendant's statement regarding possible future criminal conduct

in a hypothetical situation has at least as great a potential for prejudice in suggesting a propensity to commit crime as evidence of other crimes. Therefore, the content of and circumstances in which such statements are made must be carefully examined both in determining whether the statements fall within the state-of-mind exception, as circumstantial evidence that defendant acted in accordance with his stated intent, and in assessing whether the probative value of the evidence outweighs that potential prejudicial effect." (*People v. Karis, supra,* 46 Cal.3d at p. 636.) *Karis* concluded: "[S]tatements of intent of this nature, reflecting intent to kill a particular category of victims in specific circumstances, fall within the state-of-mind exception to the hearsay rule. (Evid. Code, § 1250.) The evidence is therefore admissible unless the circumstances in which the statements were made, the lapse of time, or other evidence suggests that the state of mind was transitory and no longer existed at the time of the charged offense." (*Id.* at p. 637.)

### c. *Discussion.*

#### (1) *Spector's intent was at issue.*

Spector asserts Tannazzo's testimony was inadmissible under section 1250 because intent was not a disputed issue at trial. Spector argues the prosecution theory was that he was only guilty of implied malice murder, a crime which did not require proof of intent to kill.

But the general rule is that Spector's plea of not guilty put at issue all the elements of the alleged crime. (See *People v. Jones* (2011) 51 Cal.4th 346, 372 [121 Cal.Rptr.3d 1, 247 P.3d 82] ["Defendant argues that only identity was actually disputed at trial, and he did not dispute the perpetrator's intent to rob . . . . Even if this is so, it is not dispositive. '[T]he prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense.' "]; *People v. Burney* (2009) 47 Cal.4th 203, 245 [97 Cal.Rptr.3d 348, 212 P.3d 639] ["Even if defendant conceded at trial his guilt of criminal homicide, ' "the prosecution is still entitled to prove its case and especially to prove a fact so central to the basic question of guilt as intent." ' "]; *People v. Steele, supra,* 27 Cal.4th at p. 1243 ["Defendant's not guilty plea put in issue all of the elements of the offenses. [Citation.] Defendant argues that he conceded at trial the issue of intent to kill. Even if this is so, the prosecution is still entitled to prove its case and especially to prove a fact so central to the basic question of guilt as intent."].)

Moreover, intent was at issue here, apart from any question of intent to kill, because the state of mind required for implied malice murder includes the intent to do a dangerous act. "Implied malice murder . . . requires . . . an intent to do some act, the natural consequences of which are dangerous to human life." (*People v. Swain* (1996) 12 Cal.4th 593, 602 [49 Cal.Rptr.2d 390, 909 P.2d 994], italics omitted.) Spector argues Tannazzo's testimony does not "logically tend to prove [he] intended to commit a life threatening act *without* an intent to kill, but *with* a conscious disregard for life." We disagree. There was conduct by Spector short of pulling the trigger that the jury could have determined was life threatening, e.g., intentionally grabbing the Colt Cobra revolver from the bureau in the foyer and intentionally putting the gun's barrel into Clarkson's mouth in order to intimidate her. As the Attorney General notes, Spector's "statement [that women deserve a bullet in the head] did not necessarily demonstrate that he was planning to intentionally kill a woman but it did strongly support a finding that he would be of the mind to intentionally commit an act with conscious disregard for a woman's life," and therefore "was relevant evidence of his intent to insert the gun in Clarkson's mouth with conscious disregard of whether it would discharge."

### (2) *Tannazzo's testimony demonstrated generic threats.*

Spector contends Tannazzo's testimony was inadmissible under section 1250 because Spector's statements did not qualify as generic threats. We disagree.

Spector argues his first statement, "These fucking cunts, they all deserve a bullet in their heads," was not an actual threat because "a comment, however pointed or angry, about what women do or [do] not 'deserve' is a far cry from a plain statement of intent to harm." Spector also argues that "[e]veryday people make comments that others, even (or especially) blood relatives, deserve fates up to and worse than death—'my brother in law should be horsewhipped'—without meaning to suggest that they themselves intend to inflict injury on those persons," and that his "statement is so extraordinarily wide-ranging, apparently applying to all women under all circumstances, that it is effectively meaningless."

By "a plain statement of intent to harm" we assume Spector is referring to an express threat like, "I'll kill any police officer who tries to arrest me." But a hypothetical generic threat need not be that explicit to be admissible under section 1250, and the large size of the targeted group does not necessarily negate the threat's relevance. (See *People v. Crew* (2003) 31 Cal.4th 822, 842 [3 Cal.Rptr.3d 733, 74 P.3d 820] [following statement was admissible as generic threat: "I've done so many things. I think I would like to kill someone, just to see if I could get away with it."]; *People v. Manson* (1976) 61

Cal.App.3d 102, 139 [132 Cal.Rptr. 265] [defendant's "frequently proclaimed prophesies of Helter Skelter" and statements that commune members " 'had to be willing to kill pigs to help the black people start the revolution' " were admissible as generic threats].)

As for Spector's assertion his statement was just meaningless hyperbole, Tannazzo testified Spector absolutely did not appear to be joking. Moreover, this was hardly an isolated example of Spector's misogyny; rather, it was embedded in a long history of extremely violent conduct toward women. The evidence gains relevance and reliability from that history, which gave the jury good reason to judge the statement as a serious threat.

As for his second statement, "That fucking cunt, I ought to put a bullet in her head right now," Spector argues it was not really a "generic" threat at all because it had been directed at a specific person, i.e., at the unknown woman getting out of the elevator, and therefore it was "not directed at a class of victims of whom Ms. Clarkson was one." But this did not make the testimony inadmissible. In *People v. Cruz* (2008) 44 Cal.4th 636 [80 Cal.Rptr.3d 126, 187 P.3d 970], the defendant was charged with killing Deputy Perrigo. There was evidence that three months earlier the defendant had reacted to a public drunkenness arrest by threatening to kill Dikes, the arresting officer, by shooting him in the back of the head. Citing *People v. Rodriguez, supra*, 42 Cal.3d 730, *Cruz* held: "The prior threat to kill a deputy by shooting him in the back of the head was 'manifestly admissible to show defendant's state of mind' at the time he fatally shot Deputy Perrigo in the back of the head." (*People v. Cruz, supra*, at p. 671.)

As to both statements, Spector complains about the long period of time, approximately 10 years, between the threats testified to by Tannazzo and Clarkson's death. He asserts, "No case in the history of California has approved a generic threat of such remoteness." But, as the trial court pointed out when it admitted Tannazzo's testimony, other evidence to be presented at trial would show a decades-long "history of acts that indicate . . . violence toward women," and therefore this threat was part of a "continuing pattern." We agree this long history tends to demonstrate the sincerity with which Spector uttered these words, and the fact that his "state of mind was [not] transitory and [still] existed at the time of the charged offense." (*People v. Karis, supra*, 46 Cal.3d at p. 637.)

 (3) *The circumstances surrounding the threats were*
 *properly admitted.*

Spector argues that, even if the threats themselves were admissible, the remainder of Tannazzo's testimony, in which he described the context in

which the threats were uttered, should have been excluded. But it was precisely these contextual details which gave meaning to the bare threats. As the Attorney General points out, this contextual evidence "involves some of the very circumstances showing that appellant meant it when he said that women should be shot in their heads: that he displayed a gun at the party, that he was in the middle of an argument with a woman that he was interested in, that he showed bravado even in front of someone he believed to be a 'cop,' and that he became so unruly as to be evicted from the party by Tannazzo. These circumstances, along with other accompanying evidence like Tannazzo's testimony that appellant was loud, yelling, and out of control, and that appellant was repeatedly stating 'those fucking cunts,' and 'that fucking cunt,' gave the jury the context for appellant's statement and rendered it more trustworthy, supporting a conclusion that he truly believed it."

As noted, section 1252 provides that evidence of a defendant's then existing state of mind "is inadmissible . . . if the statement was made under circumstances such as to indicate its lack of trustworthiness." The nonthreat portions of Tannazzo's testimony were admissible so the jury could gauge the seriousness and honesty, and hence the reliability, of Spector's statements.

### (4) *The section 352 balancing test.*

Spector argues Tannazzo's testimony should have been excluded under section 352 because it was highly inflammatory. We disagree.

During pretrial discussions, the trial court acknowledged the extreme offensiveness of the word "cunt," but refused to exclude it: "I believe . . . the statement is inflammatory, the word is inflammatory, but I believe that the probative value, because it shows the depth of the threat, the likelihood that the threat will be carried out, [makes it] admissible . . . ."[24] We agree with the trial court that, in the circumstances of this case, the word was more probative then prejudicial.

Moreover, as the Attorney General points out, "the jury was already aware that appellant used the epithet 'cunt' from his answering machine tirade at Stephanie Jennings." The Attorney General is referring to the transcription of a tape-recorded phone message Spector left Jennings which read, in part: "Last time I'm gonna say it now, I picked up all your seven fucking messages, now and I'll do every fucking thing in my power to make sure you don't work anymore in Philadelphia. In any event, it was really nice knowing you, but you're a fucking asshole and you're a fucking lying cunt."

---

[24] The trial court invited defense counsel to use voir dire to screen prospective jurors for their reactions to the word.

We conclude the trial court did not abuse its discretion by finding Tannazzo's testimony was more probative than prejudicial.

### (5) *Related instructional error claim.*

Finally, Spector argues the trial court committed an instructional error in connection with the admission of Tannazzo's testimony. We disagree.

The trial court and the parties originally decided the jury would be instructed with CALCRIM No. 375 (other crimes evidence) as to both Tannazzo's testimony and the evidence showing Spector had committed gun assaults on five other women. That instruction was going to read:

"The People presented evidence that the defendant committed other offenses of assault with a firearm, namely against Devra Robitaille, Dian[n]e Ogden-Halder, Dorothy Melvin, Melissa Grosvenor, and Stephanie Jennings, which are not charged in this case.

"The People presented evidence of other behavior by the defendant that was not charged in this case, namely the behavior testified to by Vincent Tannazzo. [¶] . . . [¶]

"If you decide that the defendant committed the uncharged offenses or acts, you may, but are not required to, consider that evidence for the limited purpose of:

"Determining whether the defendant had a motive to commit the offenses alleged in this case. For the purpose of this instruction, motive is an emotion that may impel or incite a person to act in accordance with his state of emotion.

"Or

"Establishing that the death of Lana Clarkson was not the result of accident, mistake, or suicide, but rather that the defendant was the person who committed the offense alleged in this case.

"In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offenses and acts and the charged offense.

"Do not consider this evidence for any other purpose.

"Do not conclude from this evidence that the defendant has a bad character or is disposed to commit the crime.

"If you conclude that the defendant committed the uncharged offenses or acts, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charged offense. The People must still prove each element of the charge beyond a reasonable doubt."

But defense counsel subsequently argued such an instruction would be incorrect because Tannazzo's testimony had been admitted to show intent and state of mind under section 1250, not as other crimes evidence under section 1101. The trial court agreed and it was decided the single paragraph referring to Tannazzo's testimony would be removed. However, when orally instructing the jury, the trial court inadvertently read the Tannazzo paragraph. Upon being alerted to this oversight, the court informed the jury it was going to reread CALCRIM No. 375 without the Tannazzo paragraph, but defense counsel interrupted before the court could do so:

"The Court: . . . As to instruction 375, I am going to reread it in its entirety, because if I say take out this phrase, it won't make any difference. So I will just reread it to you. Please do not give it any special—

"[Defense counsel]: Your Honor, I don't believe it's necessary to reread the instruction. We will just take it out.

"The Court: Is that satisfactory to the parties.

"[The prosecutor]: That's satisfactory to me.

"The Court: Okay. I will read you the section—you know, actually, I am not going to reread it at all. I understand what you want.

"[Defense counsel]: Exactly.

"The Court: As I read it to you [(i.e., the jury)], there is a paragraph that we are [taking] out. You can't possibly remember what it was. When you get it, the paragraph will be gone."

The written version of the instruction ultimately received by the jury omitted the Tannazzo paragraph.

Spector rightly points out that, when agreement was reached to strike the Tannazzo paragraph in CALCRIM No. 375, the trial court indicated Tannazzo's testimony should be addressed elsewhere in the jury instructions,[25] and told the attorneys, "Maybe you can work it out and talk to each other about it."

On appeal, Spector argues: "[T]he Tannazzo testimony was, for instructional purposes, effectively bundled in with the section 1101(b) testimony, and the jury was told that it could be considered on the issues of motive, lack of accident, mistake or suicide, and on the issue of whether 'defendant was the person who committed the offense alleged in this case.' In other words, the jury was not instructed on the one issue as to which the Tannazzo testimony was admitted, but was told that they could consider the evidence without limitation in deciding guilt or innocence." This, Spector asserts, constituted prejudicial error.

However, we disagree with Spector's characterization of the situation. The jury was in fact ultimately given a properly "unbundled" written CALCRIM No. 375 instruction. Judge Fidler specifically advised the jurors he had misread the instruction and that they should refer to the written version. Hence, Spector was not prejudiced by the trial court's oral misreading. (See *People v. Garceau* (1993) 6 Cal.4th 140, 189 [24 Cal.Rptr.2d 664, 862 P.2d 664], disapproved on another ground in *People v. Yeoman* (2003) 31 Cal.4th 93, 117 [2 Cal.Rptr.3d 186, 72 P.3d 1166] [misreading jury instruction was harmless error because jurors received correct instruction in written form].) Moreover, the record demonstrates the only reason the improperly "bundled" oral instruction went uncorrected was because defense counsel interrupted Judge Fidler, just as he was about to reread CALCRIM No. 375 without the Tannazzo paragraph, in order to say the defense would be satisfied by a subsequent correction to the written instruction.

As for Spector's complaint the trial court never gave an instruction specifically limiting Tannazzo's testimony to the issue of intent, it appears Spector has forfeited this claim by failing to press for such an instruction; he does not point to anywhere in the record where he subsequently asked the trial court to give that instruction. (See *People v. Brewer* (2000) 81 Cal.App.4th 442, 461 [96 Cal.Rptr.2d 786] ["We follow the long-established rule that where a court, through inadvertence or neglect, neither rules nor reserves its ruling, the party who objected or made the motion must make an effort to have the court actually rule, and that when the point is not pressed

---

[25] The trial court said: "Tannazzo's statements were admitted solely for the purpose of showing the acting on the intent . . . . So, if that doesn't belong—and I have to go read [CALCRIM No.] 375 a little closer—then, we have to put it—somewhere along the line they have to understand what that was admitted for. There has to be something."

and is forgotten the party will be deemed to have waived or abandoned the point and may not raise the issue on appeal."]; *People v. Heldenburg* (1990) 219 Cal.App.3d 468, 474–475 [268 Cal.Rptr. 255] [where trial court agreed it should have given a curative jury admonition, but then failed to do so, defense counsel's failure to call trial court's attention to this omission waived the issue].)

In any event, Spector has presented no authority for the proposition a special limiting instruction is required whenever generic threat evidence is admitted. (Cf. *People v. Ortiz* (1995) 38 Cal.App.4th 377, 389 [44 Cal.Rptr.2d 914] ["If offered to prove the declarant's state of mind, the statement [admitted under section 1250] may be introduced without limitation, subject only to section 352."].)

In sum, we conclude the trial court did not err by admitting Tannazzo's testimony. (See *People v. Geier* (2007) 41 Cal.4th 555, 587 [61 Cal.Rptr.3d 580, 161 P.3d 104] [trial court did not abuse its discretion by admitting § 1250 testimony]; *People v. Edwards* (1991) 54 Cal.3d 787, 820 [1 Cal.Rptr.2d 696, 819 P.2d 436] ["reviewing court may overturn the trial court's finding regarding trustworthiness [under section 1252] only if there is an abuse of discretion"].)

### 4. *There was no prosecutorial misconduct.*

Spector contends the prosecution committed misconduct during closing argument by impugning the honesty and integrity of defense counsel and the defense experts. There is no merit to this claim.

#### a. *Legal principles.*

"Under California law, a prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action ' "so infected the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citation.] [¶] ' "[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]" ' " (*People v.*

*Riggs* (2008) 44 Cal.4th 248, 298 [79 Cal.Rptr.3d 648, 187 P.3d 363].) A defendant who fails to object at trial "waive[s] any error or misconduct emanating from the prosecutor's argument that could have been cured by a timely admonition." (*People v. Wrest* (1992) 3 Cal.4th 1088, 1105 [13 Cal.Rptr.2d 511, 839 P.2d 1020].)

■ " ' "[T]he prosecution has broad discretion to state its views as to what the evidence shows and what inferences may be drawn therefrom" ' [citation] . . . ." (*People v. Welch* (1999) 20 Cal.4th 701, 752–753 [85 Cal.Rptr.2d 203, 976 P.2d 754].) "When we review a claim of prosecutorial remarks constituting misconduct, we examine whether there is a reasonable likelihood that the jury would have understood the remark to cause the mischief complained of. [Citation.]" (*People v. Osband* (1996) 13 Cal.4th 622, 689 [55 Cal.Rptr.2d 26, 919 P.2d 640].) "To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements." (*People v. Frye* (1998) 18 Cal.4th 894, 970 [77 Cal.Rptr.2d 25, 959 P.2d 183], disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11].)

 b. *Discussion.*

 (1) *Failure to object.*

Spector does not contest the Attorney General's assertion there was only one defense objection to all of the alleged instances of prosecutorial misconduct during closing argument. Apparently the only time Spector objected was after the prosecutor made the following remarks: "All told, the defense ended up, basically, changing everything. When it didn't work, they just changed it. If you can't change the facts, change the evidence. If you can't change the evidence, change the science, and if you can't change the science, folks, just go out and buy yourself a scientist. That may work. [¶] There may be some way to convince a jury . . . of that. Don't let that happen. See this for what it was. This was a 'pay to say' defense. You pay it; I'll say it, no matter how ridiculous it is. I'll even say blood flies around corners. [¶] The total cost to the defense to hide the truth from you folks, a staggering $419,000. Cogitate on that number for just a second. A staggering 419,000 bucks to hide the truth."

Defense counsel objected and, at a sidebar, the following colloquy occurred:

"[Defense counsel]: I think we have stepped over the line with his conduct here. Basically, what he is saying is that we paid for false testimony, that the defense paid people to lie. He is accusing me . . . of buying testimony. That is misconduct.

"The Court: If he did that and that is the way I interpreted it, I would absolutely agree with you. That is not the way I interpret it, not buying perjured testimony. . . . [B]asically, that is a fair inference, that if you pay them [(i.e., experts)] enough, they will say anything.

"[Defense counsel]: That means that we are the ones asking them to say it, and the idea is we are paying them to say untrue things. It is flat misconduct.

"The Court: That is not the way I read it, but please clear that up."

When the prosecutor resumed, he commented that at least two of the defense experts had said things helpful to the prosecution, and then he said: "The experts, generally on the defense side, said things helpful to the defense that do not, do not in any way, shape, form or fashion fit into the science in this case. You have to ask yourself why. You have to ask yourself why. [¶] Nobody cares that they are paid. Werner Spitz can make anything he wants. Like I said, he can make a million dollars or a dollar. I couldn't care less. What we are after is the truth. And you can use the amount of money that they were paid or that they were paid at all to determine how much credibility you are going to give them. That's what that figure means. How much credibility are you going to give the science experts when they have been paid this kind of money? That's what that number means."

Defense counsel did not offer any further objection.[26] Nevertheless, in the interests of judicial economy and to avert potential ineffective assistance of counsel claims, we will address the merits of Spector's prosecutorial misconduct claims. (See *People v. Yarbrough* (2008) 169 Cal.App.4th 303, 310 [86 Cal.Rptr.3d 674].)

### (2) *Attacking defense counsel.*

Spector contends the prosecution committed misconduct during closing argument by mounting "vicious attacks on the integrity of defense counsel."

---

[26] Hence, as the Attorney General points out, "in the one instance that appellant did object, he not only failed to request an admonition from the trial court, but silently acquiesced in the trial court's direction, out of caution, for the prosecution to 'please clear that up.' "

These attacks consisted of "unfounded assertions that defense counsel paid expert witnesses to give false testimony." We disagree.

 "Although counsel have broad discretion in discussing the legal and factual merits of a case [citation], it is improper to misstate the law . . . [citation] or to resort to personal attacks on the integrity of opposing counsel [citation]." (*People v. Bell* (1989) 49 Cal.3d 502, 538 [262 Cal.Rptr. 1, 778 P.2d 129].) "If there is a reasonable likelihood that the jury would understand the prosecutor's statements as an assertion that defense counsel sought to deceive the jury, misconduct would be established." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1302 [18 Cal.Rptr.2d 796, 850 P.2d 1].) On the other hand, "[a]n argument which does no more than point out that the defense is attempting to confuse the issues and urges the jury to focus on what the prosecution believes is the relevant evidence is not improper." (*Id.* at fn. 47.)

The two cases relied on by Spector to demonstrate prejudicial misconduct are inapposite. In *People v. Bain* (1971) 5 Cal.3d 839 [97 Cal.Rptr. 684, 489 P.2d 564], the prosecutor implied defense counsel had coached the defendant to lie. During closing argument, the prosecutor said: " 'You might say to yourself, "The defendant's got a good story." Did you think he was going to come in here without a good story? He's had how long to prepare . . . . I don't want to imply that my colleague here, that he told him what to say, but he has the assistance of a lawyer.' " (*Id.* at p. 845.) *Bain* held this constituted misconduct: "The unsupported implication by the prosecutor that defense counsel fabricated a defense constitutes misconduct." (*Id.* at p. 847.)

In *People v. Herring* (1993) 20 Cal.App.4th 1066 [25 Cal.Rptr.2d 213], the prosecutor implied defense counsel had suborned perjury by instructing the defendant to invent a consent defense to a rape charge. "The prosecutor's comments, i.e, '[m]y people are victims. His people are rapists, murderers, robbers, child molesters. He has to tell them what to say. He has to help them plan a defense. He does not want you to hear the truth,' were clearly improper and misconduct. His argument inferred that all those accused of crimes whom defense counsel represented are necessarily guilty of heinous crimes. Additionally, he impliedly denigrated the presumption of innocence and the requirement that guilt be proved beyond a reasonable doubt. More egregious, he inferred that defense counsel suborned perjury. It is improper for the prosecutor to imply that defense counsel has fabricated evidence or to otherwise malign defense counsel's character. [Citations.]" (*Id.* at p. 1075.) "The prosecutor's comments accused defense counsel of fabricating a defense[ and] implied that appellant lied on instructions from his counsel . . . ." (*Id.* at p. 1077.)

But as *People v. Gionis* (1995) 9 Cal.4th 1196 [40 Cal.Rptr.2d 456, 892 P.2d 1199], explained: "[B]oth of those cases reflected extreme instances of prosecutorial misconduct. In [*Herring*] . . . the [prosecutor's] argument [in effect] accused defense counsel of suborning perjury and implied that defense counsel did not believe his own client. It also implied that all those accused of crimes whom defense counsel represented were necessarily guilty of heinous crimes. [Citation.] Similarly, in [*Bain*] the prosecutor not only asserted that defendant and his counsel had fabricated a defense, but he also attacked the integrity of counsel and the office of the public defender. Additionally, the prosecutor referred repeatedly to racial matters, stating at one point that he, as a Black man, would not be prosecuting a Black defendant unless he personally believed the man to be guilty. [Citation.]" (*Id.* at pp. 1220–1221; see also *People v. Breaux* (1991) 1 Cal.4th 281, 305 [3 Cal.Rptr.2d 81, 821 P.2d 585] ["*Bain* was an extreme case of prosecutorial misconduct . . . ."].)

There was no such misconduct here. What the prosecutors accused the defense of doing was throwing a lot of money at various experts in an attempt to get Spector acquitted. The prosecutors did not accuse defense counsel of coaching witnesses or of believing that his client was guilty. In *People v. Arias* (1996) 13 Cal.4th 92 [51 Cal.Rptr.2d 770, 913 P.2d 980], the defendant complained on appeal that "the prosecutor improperly disparaged opposing *counsel* [citation] by implying that counsel had suborned false testimony by Dr. Globus 'to save their client's life.' However, we see nothing so sinister in the prosecutor's argument. At most, he suggested that the 'defense team' may have sought an expert whose technical opinions would be favorable to defendant's case. Since expert opinions are generally subject to reasonable debate, an attorney's good faith selection of a favorable expert does not reflect adversely on counsel's ethics or integrity. An argumentative reminder that defense counsel may have chosen Dr. Globus for this reason is not equivalent to an insinuation that counsel suborned perjury or engaged in deception." (*Id.* at p. 182.)

We do not think the prosecution's closing argument in this case was likely to have been construed by the jury as an attack on defense counsel's personal integrity. The prosecution's remarks were likely interpreted as "an admonition not to be misled by the defense interpretation of the evidence, rather than as a personal attack on defense counsel." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1002 [108 Cal.Rptr.2d 291, 25 P.3d 519] [referring to prosecutor's permissible argument that defense counsel's " 'job is to create straw men. Their job is to put up smoke, red herrings. And they have done a heck of a good job. And my job is to straighten that out and show you where the truth lies. . . .' "].)

Spector also complains there was nothing in the record to warrant prosecution comments to the effect that the defense was adverse to the truth. We disagree. To give just one example, the record shows that, while examining Dr. Pena and trying to shake his conclusion that Clarkson had not been suicidal, defense counsel asked: "Would it make any difference in your assessment of Miss Clarkson's frame of mind if you knew that on December 8th of 2002 she had written [an e-mail] to a friend, David Shapiro—'I am truly at the end of this whole deal. I'm going to tidy up my affairs, and chuck it because it's really all too much for just one girl?' " During the subsequent cross-examination of Shapiro, the prosecution put Clarkson's statement into proper context by reading out the very next sentence in this e-mail, which Clarkson had written after Shapiro offered to lend her money. Clarkson's e-mail actually read: "I'm truly at the end of this whole deal. I'm going to tidy up my affairs and chuck it because it's really all too much for just one girl to bear anymore. Don't worry, not before I pay you back." Shapiro testified this was just Clarkson's way of being overly dramatic and that his reply to her e-mail said, " 'Hey, do you want a check or cash.' " Defense counsel's framing of the question to Dr. Pena could be grounds for arguing the defense was trying to hide the truth.

(3) *Comments about the defense experts.*

Spector contends the prosecution committed misconduct during closing argument by denigrating the defense experts. We disagree.

The prosecution made the following kinds of remarks about the defense experts: "You can write a check for $419,000 to hire paid-to-say witnesses to get you out of what you have done." "They [(defense experts)] are willing, for a price, folks, and wait till you get this price, they are willing to come in and say suicide." "How does a homicide become a suicide? You write a big, fat check." "[J]ust go out and buy yourself a scientist."

Spector acknowledges "it is fair to ask witnesses about their compensation to show bias," but he contends "the line is crossed when the prosecution argues opinions were made up for compensation—the 'pay to say theme.' " We do not agree there was any misconduct here. In California this kind of rhetorical attack on the credibility of defense experts is permissible.

"Although prosecutorial arguments may not denigrate opposing *counsel's* integrity, 'harsh and colorful attacks on the credibility of opposing *witnesses* are permissible. [Citations.]' [Citation.] Moreover, a prosecutor 'is free to remind the jurors that a paid witness may accordingly be biased and is also allowed to argue, from the evidence, that a witness's testimony is unbelievable, unsound, or even a patent "lie." ' [Citations.]" (*People v. Parson* (2008) 44 Cal.4th 332, 360 [79 Cal.Rptr.3d 269, 187 P.3d 1].)

In *People v. Arias, supra,* 13 Cal.4th 92, the defendant complained "the prosecutor implied that witness Galvin's eyewitness account of the Beacon stabbing was more believable than Dr. Hall's forensic reconstruction of the incident because Galvin, unlike Hall, 'wasn't paid a hundred dollars for his testimony.' " (*Id.* at pp. 161–162.) The prosecutor also "described Dr. Hall as a 'so-called expert, so-called because a real scientist would never stretch any [principle] for a buck.' " (*Id.* at p. 162.) *Arias* held: "[T]he prosecutor's argument merely focused on the evidentiary reasons why the purported scientific nature of Dr. Hall's opinions could not be trusted over Galvin's eyewitness account. Claims that Dr. Hall had 'stretch[ed] [a principle] for a buck' were not out of place in that context." (*Ibid.*)

In *People v. Monterroso* (2004) 34 Cal.4th 743, 784 [22 Cal.Rptr.3d 1, 101 P.3d 956], the prosecutor discussed a defense expert's substantial fee and her history of testifying only for criminal defendants, remarking: " 'See, what you people probably don't understand, because you haven't been around the system, but there's a whole industry of these defense experts that bounce around from trial to trial, state to state, collecting good money for testimony. It is a whole industry. They don't just show up here, this isn't the first case. Next week she'll be talking about somebody else.' " *Monterroso* held: "The district attorney's characterization of [the expert's] credibility was within the bounds of proper argument." (*Ibid.*)

 The California case law relied on by Spector is inapposite. In *People v. McGreen* (1980) 107 Cal.App.3d 504 [166 Cal.Rptr. 360], disapproved on another ground in *People v. Wolcott* (1983) 34 Cal.3d 92, 101 [192 Cal.Rptr. 748, 665 P.2d 520], the prosecutor accused a defense expert of having actually committed perjury while testifying in another case. This was held to be "clearly misconduct." (*People v. McGreen, supra,* at p. 517.) Nothing like that happened here. To the extent *Sizemore v. Fletcher* (6th Cir. 1990) 921 F.2d 667, and *State v. Smith* (2001) 167 N.J. 158 [770 A.2d 255], found prosecutorial misconduct for arguing defense witnesses were not to be believed because they had been paid, these cases are out of step with California law on this point and, as the Attorney General notes, this court is not bound to follow federal circuit or foreign state authority. (*J. C. Penney Casualty Ins. Co. v. M. K.* (1991) 52 Cal.3d 1009, 1027 [278 Cal.Rptr. 64, 804 P.2d 689] ["we are not bound by decisions of other states' courts . . ."]; *People v. Bradley* (1969) 1 Cal.3d 80, 86 [81 Cal.Rptr. 457, 460 P.2d 129] [Cal. courts not bound by decisions of lower federal courts].)

In sum, we conclude Spector has failed to demonstrate there was prosecutorial misconduct during closing argument.

## DISPOSITION

The judgment is affirmed.

Kitching, J., and Aldrich, J., concurred.

A petition for a rehearing was denied May 26, 2011, and on May 5, 2011, and May 26, 2011, the opinoin was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied August 17, 2011, S193961.